Alfred Brian MITCHELL, Petitioner,

v.

Ron WARD, Warden, Oklahoma State Penitentiary, Respondent.

No. CIV–97–283–T.

United States District Court, W.D. Oklahoma.

Aug. 27, 1999.

As corrected Sept. 3, 1999.

Randy A. Bauman, Federal Public Defender's Office, Rand C. Eddy, Eddy & Jones, Oklahoma City, OK, for petitioner.

Alfred Brian Mitchell, Oklahoma State Penitentiary, McAlester, OK, pro se.

William L. Humes, Office of the Attorney General, Oklahoma City, OK, for respondent.

### MEMORANDUM OPINION

RALPH G. THOMPSON, Senior District Judge.

Alfred Brian Mitchell ("Petitioner" or "Mitchell") petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner appears through counsel and challenges his convictions and death sentence from the District Court of Oklahoma County, Case No. CRF–91–206. Respondent has responded to the petition and Petitioner has replied. The Court has reviewed the arguments and the law, as well as the state court record.[1] In addition, the Court held an evidentiary hearing on August 6, 1999, during which testimony and exhibits were received and considered.

Petitioner was tried by a jury in June 1992. He was convicted of Count I: mur-

der in the first degree; Count II: robbery with a dangerous weapon; Count III: larceny of an automobile; Count IV: rape in the first degree; and Count V: forcible anal sodomy. The jury recommended a sentence of death for Count I, 30 years imprisonment for Count II, 20 years imprisonment for Count III, 100 years imprisonment for Count IV and 20 years imprisonment for Count V. Petitioner was formally sentenced, in accordance with the jury's recommendation, on July 10, 1992.

### I. Factual Background.

Because 28 U.S.C. § 2254(e)(1) requires that this Court that presume all factual issues determined by the Oklahoma Court of Criminal Appeals are correct, the findings of the Oklahoma Court of Criminal Appeals will be relied upon as the factual background for this Memorandum Opinion. The following quoted factual background is from the Oklahoma Court of Criminal Appeals' opinion on Petitioner's direct appeal. Additional factual information is provided throughout this memorandum in connection with the legal issues to which the facts are relevant.[2]

Mitchell was released from the Lloyd Rader Center juvenile correctional facility when he reached his 18th birthday on December 23, 1990.[3] He returned to his family home in Oklahoma City, near the Pilot Recreation Community Center ("Center"). The Center served disadvantaged youth in the neighborhood of

---

1. When referenced herein, the original state court record is designated O.R., followed by specific page numbers (O.R.___). The trial transcript is referenced as Tr. Trans., p. ___. Exhibits are referenced by their sponsor and number, for example: State Ex. 2. Other transcripts are referenced by date and page, for example: 6/25/92 Trans., p. ___, with additional description as is appropriate.

2. Quotations from published decisions contained in this Memorandum Opinion include

the footnotes associated with the quotations in block format. Where quoted material is supplemented or clarified by this Court, such supplemental information is in brackets.

3. Mitchell had been incarcerated at the [Lloyd Rader] Center for approximately three years. He was adjudicated a youthful offender for the rape of a neighborhood twelve-year-old girl. Evidence of that crime was admitted during the second stage as proof of both avoiding arrest and continuing threat.

1435 N.W. Second Street. Elaine Scott, a student at the University of Oklahoma, volunteered at the Pilot Center and was at work with the Center's director, Carolyn Ross, on January 7, 1991. The Center's roof was leaking badly due to earlier heavy rains and ice storms; the Center gym was closed. About 1:35 p.m., as Ross left the Center, she met Mitchell in the hallway. They had a brief discussion during which Ross explained she was leaving but that Scott could show Mitchell the Center library. Allen Biggs, an Oklahoma City ("City") municipal roofing crew supervisor, arrived at the Center about 1:45 to check on the roof leaks. Mitchell met Biggs at the door and told him they were cleaning bathrooms, the Center was closed, and that a City crew had already placed trash buckets under the gym roof leaks. Biggs testified he felt Mitchell did not want him to enter the Center. Between 1:00 and 2:00 p.m., Velma Kibbey saw a black man in a red[4] knit cap leave the Center in Scott's car. Jessie Richards and another City worker reached the Center about 2:20; they entered the deserted Center, went straight to the gym, and spent about half an hour mopping and setting out buckets. Ross returned about 2:50 p.m. She noticed the door was not properly fastened, called out for Scott, and, through the glass in the office door, saw Scott's nude body facedown in a pool of blood. Scott's car was abandoned several blocks away.[5] During that day's investigation Billy Tuimalu directed police to Mitchell, saying Mitchell, wearing white tennis shoes and a red or orange cap, had been at the Center that day.

Mitchell v. State, 884 P.2d 1186, 1191–92 (Okla.Crim.App.1994), cert. denied 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

## II. *Procedural History.*

Following Petitioner's sentencing, he filed his direct appeal with the Oklahoma Court of Criminal Appeals. That appeal became at issue on March 11, 1994. The judgment and sentence entered in the trial court was affirmed on October 18, 1994. *Mitchell v. State*, 884 P.2d at 1186, 1191. The United States Supreme Court denied certiorari on October 2, 1995. *See, Mitchell v. Oklahoma*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). Petitioner filed his Application for Post–Conviction Relief in the Oklahoma Court of Criminal Appeals on July 1, 1996. His application was denied on February 27, 1997. *Mitchell v. State*, 934 P.2d 346 (Okla.Crim.App.1997). The Supreme Court denied certiorari on June 23, 1997. *See, Mitchell v. Oklahoma*, 521 U.S. 1108, 117 S.Ct. 2489, 138 L.Ed.2d 996 (1997).

On August 4, 1997, Petitioner filed his *Petition for Writ of Habeas Corpus by a Person in State Custody* in this Court. The petition contains eighteen grounds for relief. Petitioner later filed supplemental briefs, advancing three additional grounds for relief. The grounds advanced by Mitchell are:

1. Mr. Mitchell was found competent to stand trial under an unconstitutional standard of proof in violation of the Sixth, Eighth and Fourteenth Amendments;

---

4. Kibbey told officers that the cap was a dark "funny color" red. She testified at trial the cap was green, but admitted she could not remember, and it could have been red. Mitchell wore a dark blue and orange cap.

5. The only fingerprints found on the car matched Andre Wilson, who testified that he broke into the car after it was abandoned. Wilson saw Mitchell walking away from the car.

2. Admission of Mr. Mitchell's statement into evidence at trial violated his constitutional rights;

3. Mr. Mitchell's due process rights were violated by the trial court's instruction which permitted the jury to disregard the police's failure to record a portion of his statement;

4. Evidence obtained pursuant to search and evidence obtained from blood, hair and saliva should have been suppressed;

5. Mr. Mitchell's rights to present a defense, to a fair trial, and to a reliable determination of sentence were violated when a police officer was allowed to testify Mr. Mitchell was "disassociating" and Mr. Mitchell was not allowed to introduce contrary testimony;

6. The evidence was insufficient to establish the decedent was sexually assaulted;

7. Mr. Mitchell was denied his Sixth Amendment right to confrontation by the Trial Court's refusal to permit counsel to impeach the State's witness, Joyce Gilchrist;

8. Mr. Mitchell's Sixth Amendment rights were violated when defense counsel was prohibited from cross examining State witness Michael Harjochee about his sexual relationship with the decedent;

9. Prosecutorial misconduct in both stages of trial violated Mr. Mitchell's rights to a fair and impartial trial under the Fourteenth and Eighth Amendments to the United States Constitution;

10. Mr. Mitchell's constitutional rights were violated when the trial court refused his requested instructions on lesser-included offenses of manslaughter and murder in the second degree;

11. The "continuing threat" aggravating circumstances is unconstitutionally vague in its statutory definition and in the instructions given to Mr. Mitchell's jury;

12. The "heinous, atrocious or cruel" aggravating circumstance continues to operate outside constitutional bounds;

13. The "avoid arrest" aggravating circumstance is constitutionally infirm;

14. Fundamental error in the sentencing instructions deprived Mr. Mitchell of his constitutional rights to an individualized sentencing proceeding, to be free from the arbitrary imposition of the death penalty, and to a meaningful appellate review of his death sentence;

15. Admission of the victim impact evidence in this case violated the Ex Post Facto clause and other provisions of the Constitution;

16. Mr. Mitchell's constitutional rights were violated when the Trial Court refused to give the jury a cautionary instruction on informer testimony as requested by the defense;

17. The Trial Court's denial of Mr. Mitchell's request for allocution violated his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments;

18. The Trial Court erred in not granting the defense motion to quash the jury panel where certain cognizable classes of citizens were directly or indirectly excluded from the pool of jurors in violation of the Constitution.

19. Mitchell's nineteenth ground is contained in a supplemental brief, filed on May 26, 1998. Mitchell did not title this ground for relief, but it is

based on the argument that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) when it did not disclose exculpatory information regarding the rape and sodomy charges.

20. Sentencing evidence was double counted improperly in support of two aggravating circumstances.

21. The sentencing jury was not informed adequately of the meaning of the life without parole sentencing option, in violation of *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187 (1994).

### III. *Application of the AEDPA to the Review of the State Court Decision.*

■ *The AEDPA Applies to the Present Case.* The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") became law on April 24, 1996. The AEDPA significantly changed 28 U.S.C. § 2254, which governs the scope of this Court's review of the Oklahoma Court of Criminal Appeals' findings and decision.

Petitioner argues that, because the alleged constitutional violations for which he seeks relief occurred prior to April 24, 1996, and because he filed his appeal in the Oklahoma Court of Criminal Appeals prior to April 24, 1996, the AEDPA does not apply to his case. Respondent claims that, because Petitioner's petition was filed after the effective date of the AEDPA, the AEDPA governs this Court's review and decision. Although Respondent cites no law in support of his claim in this regard, the United States Supreme Court's opinion in *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), clearly supports Respondent's argument.

In *Lindh,* the Supreme Court decided the AEDPA does not apply to federal habeas cases which were *pending* at the time the act was passed. In the course of its discussion and decision on this issue, the Court repeatedly noted that the provisions of the AEDPA apply to habeas cases *filed* after the AEDPA took effect. *Id.* at 326, 327, 334, 117 S.Ct. 2059. Thus, there is no question that the provisions of the AEDPA guide and govern this Court's decision on the issues raised by Petitioner. *See also, LaFevers v. Gibson,* 182 F.3d 705 (10th Cir.1999).

*The Effect of the AEDPA.* Section 2254(d) provides the standards for this Court's review of the Court of Criminal Appeals' decision and now provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

While many of the circuit courts have extensively analyzed the AEDPA and reached various conclusions,[6] the Supreme

---

6. The varied views on this issue are discussed by the Sixth Circuit Court of Appeals in *Nevers v. Killinger,* 169 F.3d 352 (6th Cir.1999) *cert. denied,* 527 U.S. 1004, 119 S.Ct. 2340,

144 L.Ed.2d 237 (1999). The Sixth Circuit does not, however, believe the views taken by the Circuit Courts are necessarily at odds. *See,* 169 F.3d at 362.

Court has not yet addressed the interpretation and application of the AEDPA. The Supreme Court has, however, granted certiorari on the issue. *See, Williams v. Taylor,* 163 F.3d 860 (4th Cir.1998), *cert. granted,* 526 U.S. 1050, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999).

Although the Tenth Circuit has been reluctant to address the interpretation and application of the AEDPA,[7] a panel of the court recently provided some guidance in *LaFevers v. Gibson.* There, the Court of Appeals held:

> A state court decision is "contrary to, or involves an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" if: (1) the state court decision is in square conflict with Supreme Court precedent which is controlling on law and fact or (2) if its decision rests upon an objectively unreasonable application of Supreme Court precedent to new facts. Quite simply, the "AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal determinations." *Houchin v. Zavaras,* 107 F.3d 1465, 1470 (10th Cir.1997).

*LaFevers,* 182 F.3d 705, 711.

With these guidelines in mind, this Court will attempt to apply the mandates of Section 2254(d) in the present case.

**IV. Grounds for Relief.**

**A. Constitutionality of Finding of Competency to Stand Trial.**

Petitioner raises as his first ground for relief a claim that he was deemed competent to stand trial under an unconstitutional standard. In addition, he claims that, when his competency was evaluated, he was being inappropriately medicated with anti-psychotic drugs.[8] Mitchell argues that the fact that he was medicated renders the results of the competency examination wholly unreliable.

***The Competency Determination.*** On April 29, 1991, nearly four (4) months after Petitioner's arrest, the trial court entered an order requiring that Petitioner's competency be evaluated. The trial court's order includes a determination

> that there is a doubt as to the present competency of the said Defendant by reason of personal observation of the Defendant by this Court, and testimony regarding Defendant's ability to understand the proceedings against the Defendant and the Defendant's capability of aiding his attorney in preparation for trial.

O.R. 51. The trial court therefore ordered that the Petitioner be examined to determine (1) whether he was able to appreciate the nature of the charges filed against him;

---

7. *See, Boyd v. Ward,* 179 F.3d 904 (10th Cir. 1999), wherein a panel of the court noted that the Supreme Court had recently granted certiorari in *Williams v. Taylor.* The court declined to address the interpretation and application of the AEDPA in connection with the case before it, saying: "Pending [the Supreme Court's resolution of *Williams* ], for completeness of disposition and for purposes of this case only, without creating any standard for this circuit in other cases, we elect to review Mr. Boyd's contentions on their merits, giving deference to state court decisions where such deference has been accorded in the past." *Boyd,* 179 F.3d 904, 911–12.

8. Petitioner attached the affidavit of Manuel Saint Martin, a psychiatrist and lawyer licensed to practice law in California to his petition as Appendix A. According to Dr. Saint Martin, Mitchell was administered the anti-psychotic medications Haldol and Thorazine during the period from January 1991 to November 1991. Mitchell claims he "recently discovered" this treatment in the Oklahoma County Jail records and the lawyers who handled his petition for post conviction relief in state court were told that the records no longer existed.

(2) whether he was able to consult with his attorney and rationally assist in the preparation of his defense; (3) if the answer to either of the previous questions was no, whether the Petitioner could attain competency within a reasonable time if provided with a course of treatment, therapy or training; (4) whether the Petitioner was a mentally ill person or a person requiring treatment as defined in 43A O.S. § 3; and (5) if the Petitioner was released without treatment, therapy or training, would he probably pose a significant threat to the life or safety of himself or others. O.R. 52.

On July 3, 1991, the trial court held a post-examination competency hearing, during which the court noted that it had received a report from Kelly Shannon, Ph.D. 7/3/91 Trans., p. 3. The court invited Mitchell to call his first witness, at which time Mitchell's counsel stated "basically, Judge, we agree with the findings of Dr. Shannon that Brian Mitchell is presently competent and can be—have criminal proceedings against him resumed." *Id.* The court then addressed Petitioner and asked: "Mr. Mitchell, you've heard comments made by your counsel. Do you agree with those comments?" *Id.* Petitioner responded: "Yes." *Id.* No evidence was presented by Mitchell during this hearing. After reviewing Dr. Shannon's report on the record, the trial court entered its *Order to Resume Proceedings,* which states "there is no doubt as to the defendant's competency." *Id.,* pp. 4–5; O.R. 73.

**The Supreme Court's Decision in Cooper v. Oklahoma.** At the time Petitioner's competency hearing was held, Oklahoma law required criminal defendants to prove their incompetence to stand trial by "clear and convincing evidence." 22 O.S. § 1175.4(B).[9] The Supreme Court decided

*Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), after Petitioner was convicted and his direct appeal had been filed. In *Cooper,* the Supreme Court held Oklahoma's requirement that a criminal defendant prove a claim of incompetency by clear and convincing evidence violated the right to due process under the Fourteenth Amendment. As a result, the burden of proof applicable at the time the trial court deemed Mitchell competent to stand trial was unconstitutional.

█ If an incorrect standard of proof was used to determine competency in state court, the court's determination is not entitled to a presumption of correctness. This situation would be analogous to Mitchell having had no competency hearing at all. *Walker v. Attorney General,* 167 F.3d 1339, 1345 (10th Cir.1999); *Barnett v. Hargett,* 174 F.3d 1128, 1135 (10th Cir. 1999). If Mitchell had no competency hearing at all, he would be entitled to relief only if he demonstrated "that the trial court ignored facts which raised a 'bona fide doubt' regarding [his] competency to stand trial." *Rogers v. Gibson,* 173 F.3d 1278, 1290 (10th Cir.1999) (citing *Walker*). Considerations in this inquiry include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on his competence to stand trial." *Id.*

**Procedural Bar.** Respondent chose not to respond to the merits of Petitioner's claim. Rather, Respondent argues only that Petitioner's claims are procedurally barred.

█ A procedural bar applies to, and habeas relief is generally unavailable for,

9. A person is incompetent if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

federal claims "defaulted in state court on an adequate and independent state ground." *Barnett*, 174 F.3d at 1134. "The law of procedural defaults thus applies to preclude federal habeas review of claims that have not been adjudicated on the merits by a state court because of noncompliance with a state procedural rule." *Brecheen v. Reynolds*, 41 F.3d 1343, 1354 (10th Cir.1994).

The Oklahoma Court of Criminal Appeals considered this claim on post-conviction and, contrary to Respondent's argument, did not apply a procedural bar. Rather, the court simply declined to consider Mitchell's claim that the clear and convincing standard applied in the trial court's competency determination violated his right to due process. The Court of Criminal Appeals did not determine that Mitchell had not complied with state law. The court simply refused to apply the Supreme Court's holding in *Cooper* in the case before it: "We decline to apply *Cooper* retroactively on post-conviction review. This proposition is denied." *Mitchell*, 934 P.2d at 349. In support of this statement, the court cited its opinion in *Walker v. State*, 933 P.2d 327 (Okla.Crim.App.1997), where it held that a similar claim, grounded on the Supreme Court's *Cooper* decision, was procedurally barred.

The Court of Criminal Appeals gave no indication that Mitchell's claim was denied because Mitchell defaulted on an adequate and independent state ground. In fact, the court's indication is to the contrary.

While the court gave no reason for its refusal to apply the *Cooper* decision to the case before it, the court stated it would not consider issues which were raised on direct appeal and therefore barred by res judicata or were not raised on direct appeal, but could have been, and were therefore waived. The court specifically discussed a number of issues in these categories, but did not mention the issue of Mitchell's competency determination. *Mitchell*, 934 P.2d at 348.

Furthermore, the Tenth Circuit Court of Appeals recently held that the Court of Criminal Appeals' application of a procedural bar in *Walker* was incorrect. The Tenth Circuit determined that Walker was "not procedurally barred from seeking habeas relief on his *Cooper* claim by his failure to raise it in his first state post-conviction petition." *Walker v. Attorney General*, 167 F.3d 1339, 1345 (10th Cir. 1999).[10] Even if the Court of Criminal Appeals had applied a procedural bar to Mitchell's claim, which is based on the same grounds as was Walker's, the procedural bar would not be valid. *See, Barnett*, 174 F.3d at 1134–35.

***The Merits · of Mitchell's Claim.*** Mitchell's claim that he was denied his right to a competency hearing because an unconstitutional burden of proof is unpersuasive in light of the facts. Mitchell cannot identify any evidence which raises bona fide doubt regarding his competency to stand trial and which was ignored by the trial court. He presented *no evidence*

---

**10.** The Court of Criminal Appeals ruled that Walker's failure to raise his claim on direct appeal or in his previous post-conviction proceeding caused the claim to be procedurally barred by virtue of amendments to Oklahoma's statutory post-conviction procedures. The amendments were enacted after Walker's direct appeal and initial post-conviction proceeding had been filed. *Walker*, 167 F.3d at 1343. The Tenth Circuit rejected this logic, holding that the proper time to determine whether a procedural rule, such as Oklahoma's statutory post-conviction procedures, was firmly established and regularly followed is the time of the purported procedural default. *Id.* at 1344–45. "A defendant cannot be expected to comply with a procedural rule that did not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed." *Id.* at 1345 (citation omitted).

supporting his claim of incompetency in the trial court. The trial court, therefore, could not have applied an unconstitutional burden of proof in the competency determination. No weighing or evaluation of the evidence was necessary. Mitchell was examined by a doctor and determined competent. Mitchell agreed with the competency report presented by the state. He presented no evidence of irrational behavior. This Court has thoroughly reviewed the transcripts of the preliminary hearing, the trial, and the sentencing in this matter. Mitchell testified during each phase. There is no indication, either in Mitchell's testimony or from any statements by trial counsel, that Mitchell did not fully understand the proceedings against him or was not able to assist in his defense. Mitchell's conduct at trial and his sentencing appears from the record to have been appropriate.

█ In a belated attempt to support his procedural competency claim, Mitchell claims he was medicated with anti-psychotic drugs during an eleven-month period, ending approximately seven months before his trial. Notably, however, the lawyer/psychiatrist who presented an affidavit in support of this claim *does not* state that his research and examination of Mitchell indicates Mitchell was incompetent at the time of trial.

There is no indication in the record, or in Mitchell's briefs filed in this Court, that Mitchell's trial counsel or the trial court had any question regarding his competency at any time after the competency hearing. Mitchell did not request a second competency hearing at any time during the year between the competency hearing in July 1991 and the trial in June 1992. Mitchell has failed to present any evidence to this Court which indicates "that the trial court ignored facts which raised a 'bona fide doubt' regarding his competency to stand trial." Habeas relief on this ground is therefore denied.

## B. *Constitutionality of Interrogation and Validity of Confession.*

Petitioner bases his second ground for relief on his interrogation by the police and resulting statement/confession. Petitioner claims that he requested an attorney after the police placed him in custody, but his request was denied. Police and the respondent have steadfastly maintained that Petitioner was not a suspect when his interrogation began and when he was Mirandized. Petitioner became a suspect at about the half-way point in the day-long interrogation. Although the officers told Petitioner he was in custody at that point, he was not re-Mirandized. Petitioner argues that this failure to give a *Miranda* warning after he was placed in custody renders all statements and evidence obtained via the subsequent interrogation inadmissible. Finally, Petitioner argues his confession was involuntary because of the totality of the circumstances which surrounded it.

*The Interrogation and Confession.* Mitchell initially spoke with Oklahoma City Police Detective Maddox and Sergeant Paige the day of the murder. Trans., *Jackson v. Denno* hearing, 6/12/92, p. 35. During the conversations he had with the officers,

> Mitchell confirmed that he had been [at the Center] and told police he had seen two older black men at the Center "messing with" Scott. Mitchell accompanied police to the Oklahoma City Police Department drunk tank and various homeless shelters, trying to identify the men. Mitchell denied being in the Center's office, gave the officers his white Troop tennis shoes for testing, and agreed to come with his mother to the police station the next morning to give a formal statement and further descriptions of the men. At Mitchell's request, officers transported the two to the sta-

tion on January 8. While his mother waited, Mitchell waived his Miranda rights, repeated his information from the previous day, then over several hours gave several stories to the officers. These stories culminated in admissions of presence at the scene and guilt which stopped short of confessing to murder; Mitchell insisted that another man who acted with him had killed Scott and denied any sexual acts. Forensic evidence connecting Mitchell to the crime included: (1) bloody footprints matching his tennis shoes (from Scott's blood), (2) hair and fiber evidence, (3) sperm and various types of blood evidence.[11] Mitchell's finger had a recent injury, and he admitted injuring it at the scene.

. . . .

Mitchell's January 8 statements began at about 11:00 a.m. and were videotaped. The first tape, which is four hours long, ends abruptly as Mitchell and Officer Maddox discuss body sample and search waivers. The second tape begins with Mitchell's final story regarding the events at the Center. Testimony at trial and in the *Jackson–Denno* [12] hearing estimated a gap of perhaps 45 minutes between the two, during which a forensic chemist obtained body samples from and three officers had a brief conversation with Mitchell.

Although he was given, and waived, his Miranda rights at the outset, the record shows that Mitchell was not a suspect when questioning began. Over the course of the first tape his status changed as his stories kept changing and as officers became aware of forensic evidence linking Mitchell to the scene. Near the end of the first tape Maddox told Mitchell that although he was still considered a witness he was too involved to be allowed to leave and would be jailed in connection with the homicide. Maddox and Mitchell's testimony agreed that, after that tape ended, Mitchell asked, "Do I need an attorney?" or "Do you think I need an attorney?" Maddox testified he replied that the decision was Mitchell's and he could not advise him. Mitchell's *Jackson–Denno* testimony was that Maddox told him he did not need an .attorney because they would work out a deal; at trial he testified Maddox told him he did not need an attorney because he was too deep in the crime.

*Mitchell v. State,* 884 P.2d at 1192–93.

■ *Validity of Claimed Request for Counsel During Interrogation.* Petitioner argues that his question to the officers "Do I need an attorney" or "Do you think I need an attorney" constituted a request for counsel which required that the officers cease questioning until he was provided an attorney. Petitioner claims that, because he was denied his right to counsel, the evidence obtained after the request (his videotaped testimony/confession as well as samples of his hair and saliva) were inadmissible at trial.

The Oklahoma Court of Criminal Appeals addressed Mitchell's argument on his direct appeal. The court, relying on a decision of the Supreme Court, rejected Mitchell's claim:

11. In addition to other evidence, four fibers consistent with Mitchell's coat were found on Scott's body, Mitchell's blood was on Scott's panties, inside her jeans, and the back of her shirt, and sperm consistent with Mitchell was on Scott's panties and shirt sleeve and recovered from an anal swab. [But see this Court's discussion of this evidence in connection with Part IV(F), *infra* ].

12. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an *in camera* hearing on the voluntariness of his confession.

The Supreme Court has recently held that after a knowing and voluntary waiver of Miranda rights, law enforcement officers may continue questioning through equivocal statements until a suspect clearly requests an attorney; although the [Supreme] Court suggests it is good police practice to clarify any equivocal statement, this is not required.[13] We need not reach this issue as Mitchell's statement does not rise to the level of an equivocal request for counsel.

Mitchell's question "Do I need an attorney?" is not a request for counsel. Under certain circumstances this question could amount to a request for counsel—if the defendant is young, inexperienced or unfamiliar with the criminal justice system, of low intelligence, mentally disabled or ill, or overwhelmingly upset or overwrought. None of those concerns are relevant here. Mitchell had just turned 18 but he was familiar with the criminal justice system through the juvenile courts. He was twice picked up for offenses before his arrest and adjudication on the rape charge, he had the benefit of counsel for that charge, and he had been given Miranda warnings at that time. His taped statements clearly indicate that he was in over his head during questioning. However, his statements do not support his claim that he wanted a lawyer or that he did not wish to continue talking when he made the statements on the second tape. Trial testimony showed Mitchell is of at least average intelligence, has completed his GED, and has some writing ability. There was no indication of mental problems. The circumstances here indicate that the statement was neither equivocal nor ambiguous, was certainly not an unequivocal request for counsel,[14] and did not invoke Mitchell's right to counsel.[15]

*Mitchell,* 884 P.2d at 1193.

***Federal Law as Determined by the Supreme Court.*** In *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court announced the standard on which the Oklahoma Court of Criminal Appeals relied in its decision. The Supreme Court held:

[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning .... Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." .... [The suspect] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards[ v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378

---

**13.** *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

**14.** [This Court notes that, contrary to the Court of Criminal Appeals decision, Mitchell's statement was an *equivocal* request for counsel. *See, United States v. March,* 999 F.2d 456 (10th Cir.1993), *cert. denied,* 510 U.S. 983, 114 S.Ct. 483, 126 L.Ed.2d 434 (1993).]

**15.** Mitchell claims that any error here could not be harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In fact, even if this court found error, the only statements excluded would be those from the second tape; Mitchell has not argued that the first tape should be excluded. It is entirely possible a jury could have disregarded the second tape, given the first tape and Mitchell's trial testimony, when voting to convict.

(1981)] does not require that officers stop questioning the suspect.

. . . .

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney . . . . But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

*Id.* at 459, 461–62, 114 S.Ct. 2350.

As the Court of Criminal Appeals recognized, it would have been good practice for the officers to clarify Petitioner's ambiguous request for counsel. The Supreme Court has, however, clearly decided that such a practice is not required. As a result, the Court of Criminal Appeals' decision was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. Petitioner's claim in this regard is without merit and habeas relief on this ground is denied.

**Effect of Officers' Failure to Re–Mirandize Petitioner After He was Placed in Custody.** Despite the fact that he was not a suspect, and was not in custody, Petitioner was informed of his *Miranda* rights when he was taken to the police station on the morning of January 8, 1991. He was presented with a document titled "INTERROGATION ADVICE OF YOUR RIGHTS," which he signed before the interrogation began. Trans. *Jackson v. Denno* hearing, 6/12/92, pp. 49–51; State's Ex. 1. He was not reminded of those rights at any other time during the interrogation on January 8—even after he unquestionably became a suspect and even after the interrogation changed from a non-custodial to a custodial interrogation, in the eyes of the interrogators. Petitioner now argues that he was required to be informed of his *Miranda* rights again after he had been questioned for several hours and was told he would not be allowed to leave the police station.

*Court of Appeals' Decision.* The Court of Criminal Appeals did not address this issue on the merits, as it was not raised in Petitioner's direct appeal. On post-conviction, the court determined the issue was procedurally barred as a result of Mitchell's failure to raise it on direct appeal. *Mitchell*, 934 P.2d at 348, n. 9. In applying the procedural bar, the Court of Criminal Appeals relied on the Oklahoma Post Conviction Procedure Act which was amended *after* Mitchell's direct appeal was filed. The court held:

Under Oklahoma's post-conviction statutes, the only issues that can be raised on post-conviction are those which: "(1) [w]ere not and could not have been raised in a direct appeal; and (2)[s]upport a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 22 O.S. Supp.1995, § 1089(C). On review, this Court must determine: "(1) whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist; (2) whether the applicant's grounds were or could have been previously raised; and (3) whether relief may be granted . . . ." 22 O.S. Supp.1995, § 1089(D)(4)(a). The Post–Conviction Procedure Act is not intended to provide a second appeal. This Court will not consider an issue which was raised on direct appeal and is therefore barred by res judicata, nor will we consider an issue which has been waived because it could have been raised on direct appeal but was not. We will not address Mitchell's propositions which are barred by waiver or res judicata . . . .

*Id.* at 348 (internal citations to cases omitted). The court determined the present issue was waived because it "could have been raised on direct appeal." *Id.* at 348, n. 9.

■■■ *Procedural Bar.* As previously discussed, a procedural bar may be applied only where "the procedural rule used to bar consideration of a claim [has] been 'firmly established and regularly followed' by the time as of which it is to be applied." *Walker,* 167 F.3d at 1344 (citations omitted). While the Court of Criminal Appeals cited and quoted the amended Post Conviction Procedures Act in support of its application of the procedural bar in the present case, the rule on which it relied has long been "firmly established and regularly followed." The Oklahoma Court of Criminal Appeals has consistently refused to consider claims first raised on post-conviction which could have been raised on direct appeal or in a previous post-conviction proceeding. *See,* 22 O.S. § 1086; *Harrell v. State,* 493 P.2d 461 (Okla.Crim. App.1972) (court could not grant post conviction relief where application raised no issue which could not have been raised on direct appeal and no constitutional issues); *Coleman v. State,* 693 P.2d 4, 5 (Okla. Crim.App.1984) ("res judicata bars consideration in post-conviction proceedings of issues which have been or could have been raised on direct appeal."); *Banks v. State,* 810 P.2d 1286 (Okla.Crim.App.1991) (propositions waived because they could have been raised on appeal or on the first post-conviction application (citing 22 O.S. § 1086)); *Rojem v. State,* 829 P.2d 683 (Okla.Crim.App.1992) (issues which could have been raised on direct appeal, but were not, are waived (citing 22 O.S. § 1086)); *Mann v. State,* 856 P.2d 992 (Okla.Crim.App.1993) (same). The rule applied by the Court of Criminal Appeals is therefore adequate. *Moore v. Reynolds,* 153 F.3d 1086, 1097 (10th Cir.1998).

This Court is of the opinion that the Tenth Circuit Court of Appeals' decision in *Walker* is distinguishable from and inapplicable to the present procedural bar analysis. In *Walker,* the Court of Appeals reversed the application of a procedural bar because the bar arose from the amended Post Conviction Procedures Act. The Court noted:

A defendant cannot be expected to comply with a procedural rule that does not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed.

*Walker,* 167 F.3d at 1345 (citations omitted). The present situation is distinguishable. While the Court of Criminal Appeals in *Mitchell* cited only the amended act in support of its application of the procedural bar, the amended act did not change the law. In contrast to *Walker,* the procedural rule on which the Court of Criminal Appeals relied in *Mitchell* existed at the time the direct appeal was filed.

Mitchell's claim that he should have been re-Mirandized after he was actually placed in custody is procedurally barred.

*Ineffective Assistance of Counsel.* Anticipating the validity of the procedural bar applied by the Court of Criminal Appeals, Petitioner argues that he may nevertheless proceed with his claim because it was waived due to the ineffectiveness of his counsel. He claims the failure of his counsel to raise the issue on direct appeal demonstrates cause and prejudice sufficient to overcome the procedural bar. The Court of Criminal Appeals considered and denied Mitchell's claim of ineffective assistance of appellate counsel on the merits. *Mitchell,* 934 P.2d at 348 n. 9, 350–51.

■■ "A habeas petitioner may establish cause for his procedural default by showing that he received ineffective assistance

of counsel in violation of the Sixth Amendment." *Banks v. Reynolds,* 54 F.3d 1508, 1514 (10th Cir.1995), citing *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986); *United States v. Cook,* 45 F.3d 388, 392 (10th Cir.1995); *Hardiman v. Reynolds,* 971 F.2d 500, 505–06 (10th Cir.1992).

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that his counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To show that a trial result is not reliable, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2067.

If the defendant cannot meet the burden of proving the result of his trial would have been different but for the alleged error, it is not necessary to determine whether counsel's performance was deficient. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. at 2069.

Because, as is discussed below, Petitioner's underlying claim lacks merit, Petitioner's ineffective assistance claim is also without merit. Petitioner was not prejudiced by his counsel's failure to raise a meritless claim.

■ *The Merits of Petitioner's Argument.* Petitioner relies on the Supreme Court's *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), decision to support his argument that he was entitled to a second *Miranda* warning after he was placed in custody. *Miranda* does not, however, extend as far as Petitioner would like. *Miranda* requires

the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it.

*Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984).

The Supreme Court has recognized that there are competing, compelling interests at play when a suspect is subjected to a custodial interrogation. Admissions of guilt are "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986). On the other hand, a suspect is entitled to protection from the risk that "police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Id.* (citations omitted). A suspect's Fifth Amendment right is adequately protected if the suspect adequately understands that, at any time, he can bring a proceeding to a halt or, short of that, call in an attorney to

give advice and monitor the conduct of his interrogators. *Id.*, 475 U.S. at 426–27, 106 S.Ct. at 1144. "[F]ull comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process ...." *Id.*, 475 U.S. at 427, 106 S.Ct. at 1144.

In support of his argument, Petitioner relies on various decisions which hold that *Miranda* warnings are not required until a suspect is placed in custody. *See, U.S. v. Hocking,* 860 F.2d 769 (7th Cir.1988); *U.S. v. Feather,* 801 F.2d 157 (4th Cir.1986); *U.S. v. Flitcraft,* 863 F.2d 342 (5th Cir. 1988). These cases do not, however, go so far as to be helpful to Petitioner. Petitioner has not cited, and this Court has been unable to find, any case which requires a person in Petitioner's situation to be re-Mirandized.

Mitchell was given, and waived, his *Miranda* rights before he was questioned, but before he was technically in custody. *Mitchell,* 884 P.2d at 1192. He was questioned for several hours. *Id.* Officers then told Mitchell he would not be released, but would be jailed in connection with the homicide. *Id.* There was no break in the questioning, no reason Petitioner would be under the impression that the rights of which he had been informed, and which he had waived, a few hours earlier were not still applicable and available to him. The requirement that Mitchell be informed of his rights and given the opportunity to exercise them or waive them was met in this case.

■ *Voluntariness of Statement.* In his third claim regarding his statement/confession, Mitchell argues his con-

fession was not freely and voluntarily given. In rejecting this claim, the Oklahoma Court of Criminal Appeals stated:

In proposition three Mitchell claims the trial court erred in finding Mitchell's confessions were knowingly, intelligently and voluntarily given and in permitting the jury to hear evidence of the confessions. The proposition seems to go only to that portion of the confession taped after Mitchell asked if he needed an attorney. During the second tape Mitchell abandoned his story of two black men who did everything, and admitted participation in a robbery and assault on Scott, while insisting that another man (not mentioned in the first tape) bore the greater responsibility and delivered the fatal blows. Insofar as the proposition relies on the theory that Mitchell requested counsel before the second taped statement, it must fail.

Mitchell also argues more generally that his confession was the product of coercion. A confession is voluntary if it is the product of the maker's free and unconstrained choice, and courts should look to the totality of the circumstances surrounding the confession, including the character of the defendant and the details of the interrogation.[16] The trial court must determine whether a defendant actually invoked his right to counsel; if so, any response to further questioning will be admissible only if the defendant initiated further discussion and knowingly and intelligently waived the right he had invoked.[17]

Mitchell did not invoke his right to counsel between the first and second taped statements, nor did he request counsel

---

16. See, e.g., *Salazar v. State,* 852 P.2d 729 (Okl.Crim.App.1993); *Crawford v. State,* 840 P.2d 627 (Okl.Crim.App.1992); *Castro v. State,* 745 P.2d 394 (Okl.Crim.App.1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).

17. *Pickens v. State,* 850 P.2d 328 (Okl.Crim. App.1993), cert. denied, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Walker v. State,* 795 P.2d 1064 (Okl.Crim.App.1990).

when he was informed of his Miranda rights before questioning began. Mitchell concedes that when he was read his rights, signed a waiver, and agreed to talk to police, he was not a suspect and was free to leave. As the interview progressed Maddox asked Mitchell at least twice if he wanted time to think, and left Mitchell alone in the interview rooms two or three times. Mitchell always insisted he did not want time to think. He persisted in giving the officers explanations and became angry when they would not let him finish or interrupted him. Several times he said he did not know or understand what the officers wanted, but this was always in response to their comments that they believed he was lying. Although Mitchell's demeanor is somewhat more subdued on the second tape, it is much shorter than the first and his moods changed throughout the course of the first tape.[18]

Mitchell's argument must finally fail because he cites no instances of coercion, relying only on a picture of a pitifully confused defendant. Even were this description correct, any confession is voluntary absent coercion.[19] Mitchell's worst accusation here appears to be continued interrogation. This simply is not coercion and cannot be used to support this claim.

*Mitchell,* 884 P.2d at 1194–95.

Petitioner argues that the Court of Criminal Appeals' interpretation and determination of the facts relating to his voluntariness claim are inaccurate. Petitioner relies on his interpretation of the facts presented with his post-conviction application and claims that the facts, as interpreted by him, support a conclusion that his confession was not voluntary. Petitioner's personal rendition of the facts is not enough, however, to rebut the presumption that the Court of Criminal Appeals' determination of the facts is correct. 28 U.S.C. § 2254(e)(1). Mitchell bears the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Mitchell's argument that the Court of Criminal Appeals is wrong, with nothing more than an alternate interpretation, does not meet this burden.

This Court is not free to re-evaluate the facts and second-guess the Oklahoma Court of Criminal Appeals' factual determination, as Petitioner urges. Petitioner cites no Supreme Court case which is controlling on law and fact. This Court cannot say, and, in fact, Petitioner does not argue, that the Court of Criminal Appeals' decision is contrary to, or involves an unreasonable application of, Federal law as determined by the Supreme Court. Habeas relief on this ground is denied.

### C. *Constitutionality of Jury Instruction Excusing the Police Failure to Record a Portion of Petitioner's Custodial Interrogation.*

The police officers interrogated Mitchell for several hours on January 8, 1991. All but about 45 minutes of the interrogation was videotaped. Trans. *Jackson v. Denno* hearing, 6/12/92, pp. 100–101. Petitioner bases his third ground for relief on a

---

**18.** Mitchell's claims that he was a young, inexperienced offender have very little support in the record. Mitchell uses his request to talk to his mother to bolster his picture of youthful confusion. This Court has held that a defendant's request for a parent does not amount to a request for counsel, *Robedeaux v. State,* 866 P.2d 417 (Okl.Crim.App.1993), and the tape does not support the inference that

Mitchell wanted to see his mother for legal assistance or support.

**19.** Cf. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (confession of mentally ill person voluntary absent coercion); *Fontenot v. State,* 881 P.2d 69 (Okl. Crim.App.1994).

claim that his due process rights were violated by the jury instruction excusing the police failure to videotape this segment of the interrogation. The jury was instructed:

> You are instructed that there is no duty upon law enforcement officials to videotape statements or interviews between subjects and law enforcement officers. O.R. 402.[20] Petitioner claims that the trial court erred in giving this instruction. Petitioner's argument is grounded on his interpretation of the facts and Oklahoma law. Petitioner claims the jury instruction violated his "rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution."

**Procedural Bar.** On post-conviction, the Oklahoma Court of Criminal Appeals determined this claim was procedurally barred as a result of Mitchell's failure to present it in his direct appeal. *Mitchell*, 934 P.2d at 348. Mitchell does not argue the claim is not procedurally barred but, instead, focuses on his claim of ineffective assistance of counsel based on counsel's failure to raise the claim on direct appeal.

Initially, this Court holds that the Oklahoma Court of Criminal Appeals' application of the procedural bar was proper, based on the analysis at pages 18–19, above.

**Ineffective Assistance of Counsel.** The Oklahoma Court of Criminal Appeals addressed the merits of Mitchell's claim that the failure to raise the present issue on appeal constituted ineffective assistance of counsel. The court determined the claim was without merit. *Mitchell*, 934 P.2d at 346.

Again, this Court's assessment of the ineffective assistance of counsel claim can be made by determining whether Mitchell was prejudiced as a result of his counsel's alleged ineffectiveness.[21] Because, as is explained below, Petitioner's underlying argument is without merit, his ineffective assistance of counsel claim must fail.

*The Merits of Petitioner's Argument.* A petitioner in a habeas proceeding attacking a state court judgment on the basis of an erroneous jury instruction has a great burden. *Maes v. Thomas*, 46 F.3d 979 (10th Cir.1995).

> A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.

*Id.* at 984 (quotation marks and citations omitted); *see also, Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir.1997), *cert. denied*, 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998).

■ "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 153, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977). The question is whether the instruction complained of "by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even 'universally condemned.'" *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

---

20. Mitchell's trial counsel objected to this instruction. The trial court overruled the objection. Trial Tr., pp. 1310–1313.

21. See page 1211, above.

Federal courts are not free to grant habeas relief simply because an instruction was based on an incorrect interpretation or application of state law. *Id.*

■ Petitioner claims the jury instruction at issue was an improper statement of Oklahoma law. Even if true, such an argument does not help Petitioner here. Although Petitioner claims that "the obvious effect" of the jury instruction was to undermine "any confidence that Mr. Mitchell received a fair, reliable, and constitutional trial," he cites no law which supports this statement. Despite the Respondent's failure to address the merits of Petitioner's claim at all, Petitioner is unable to meet the formidable burden with which he is faced. It certainly cannot be said that the challenged instruction deprived him of a fair trial or deprived him of due process of law. The instruction was not in square conflict with Supreme Court precedent which is controlling on law and fact, and was not an objectively unreasonable application of existing precedent to new facts. Habeas relief on this ground must therefore be denied.

### D. *Validity of Waiver Through Which Police Obtained Blood, Hair and Saliva Evidence.*

Petitioner signed a document titled "Oklahoma City Police Department Waiver of Search of Body" on January 8, 1991. State Ex. 2. By Mitchell's own admission, he signed the waiver voluntarily. Tr. Trans., p. 1286. Police then obtained blood, saliva and hair samples from Petitioner which were used by the State at trial. Petitioner claims he consented to the search and to allow the police to obtain the samples after he made his request for

counsel. Therefore, Petitioner claims, the search violated his constitutional rights and the evidence obtained via the search should have been suppressed.

*The Oklahoma Court of Criminal Appeals' Decision.* The Court of Criminal Appeals rejected this argument on Mitchell's direct appeal:

> Mitchell claims that because the body samples were taken and search waiver signed after his question, "Do I need an attorney?", the search evidence should be suppressed .... The question at issue did not invoke Mitchell's right to counsel, therefore his subsequent waiver and consent were not tainted and this proposition must fail.

*Mitchell*, 884 P.2d at 1193–94.

For the reasons set forth at section IV(B), above, this Court rejects Mitchell's argument, as well.[22] Habeas relief on this ground is denied.

### E. *Police Officer's Testimony Regarding "Disassociation" and Trial Court's Refusal to Allow Mitchell to Present Rebuttal Testimony/Evidence.*

***The Factual Background and Court of Criminal Appeals' Decision.*** During the officers' interrogation of Mitchell, Mitchell "told a series of stories in which he admitted watching some of the violence at the scene. Officer Maddox told Mitchell he believed Mitchell was experiencing disassociation ...." *Mitchell*, 884 P.2d at 1197. Maddox believed Mitchell was disassociating because he was relating an experience in which he had participated as though he had been a witness, rather than a participant. *Id.* "At trial Maddox reiterated the

---

**22.** Mitchell's trial counsel did not object to the admission of the body samples into evidence during his trial. Mitchell argues that, if the failure to so object is deemed to have waived the issue for purposes of his habeas

petition, then his trial counsel was ineffective. Because the claim itself is without merit, there is no need for this Court to address the waiver and ineffective assistance of counsel issues.

definition of disassociation and explained why he believed Mitchell was disassociating during questioning." *Id.*

The Oklahoma Court of Criminal Appeals presented the following analysis of this testimony:

Mitchell now claims that this amounted to a lay person giving a medical diagnosis and was thus improper. This contention is unpersuasive. Even if it had merit, Mitchell did not raise this objection at trial: he objected vigorously on the grounds that Maddox was improperly bolstering the taped statements and asked that he be allowed to present his own witness who could interpret Mitchell's body language on the videotape. When a defendant objects on a specific ground at trial, this Court will not entertain an objection on appeal which differs from the trial objection.[23]

Mitchell's claim in proposition nine fails with the previous argument. Mitchell argues the trial court erred in not allowing him to offer evidence to rebut the testimony of Officer Maddox concerning Mitchell's alleged psychological "disassociation". In the first stage, Mitchell wanted to call a developmental psychologist, Wanda Draper, to interpret his attitude and body language and the interview mechanisms throughout the course of the tapes. During an ex parte hearing the trial court correctly told counsel this evidence was inadmissible in the first stage as it would invade the jury's fact-finding province. After Mitchell's testimony concluded, defense counsel made an offer of proof that, if called in the first stage, Draper would testify about Mitchell's developmental history and its effect on his responses. Fur-

thermore, defense counsel expected Draper to explain Mitchell's body language throughout the course of the tapes in order to counter Maddox's observation that Mitchell was lying during the interview. The trial court again determined that Draper's testimony would usurp the jury's role by giving her opinion as to Mitchell's guilt or innocence. The weight and credibility of witnesses is the exclusive domain of the jury.[24] In the first stage of trial Mitchell wanted Draper, an expert, to interpret and explain Mitchell's actions and motives on the tapes, which is exactly what the jury was required to do in determining the weight and credibility to afford Mitchell's statements. Mitchell argues that the State opened the door for this through Maddox's comments about disassociation and his testimony that he watched Mitchell's body language as one clue that he was lying. As the trial court noted, Maddox was not offering those opinions as expert aids to the jury. Maddox's testimony was not error and Draper's testimony would have infringed on the jury's responsibility. There was no abuse of discretion.

*Id.*

The following excerpt from the trial transcript demonstrates what actually occurred during trial after the first part of the videotaped interrogation (State Ex. 81) was viewed by the jury:[25]

Q: Now you referred to disassociation on the tape.

MR. ROWAN: Judge, may I approach the bench?

THE COURT: Yes.

(WHEREUPON, the following proceedings were had at the bench with the

---

**23.** *Trim v. State,* 808 P.2d 697, 699 (Okl.Crim. App.1991)

**24.** *Curtis v. State,* 762 P.2d 981, 983 (Okl. Crim.App.1988).

**25.** Detective John Maddox was being presented for direct examination by Assistant District Attorney Deutsch.

Court and counsel present and out of the hearing of the jury:)

MR. ROWAN: Your Honor, I object to this line of questioning in that it's going through and bolstering the videotape. He is going through and commenting and certainly giving his interpretation of things that the jury has seen. I think that's improper, Judge.

MR. DEUTSCH: There is no law. We're not—this is not cumulative evidence. We're asking the witness to explain what happened. This would be the same if we had an undercover drug tape that we had played for the jury and get the witness to explain various terms and things that are happening. This is not cumulative evidence. We're not going through this again.

There is no law that I'm aware of that does not allow a witness to explain what is happening in an interview anymore than a crime scene, Judge.

THE COURT: Objection will be overruled.

MR. ROWAN: Well, then, Your Honor, we would allow—we would ask, then, to be allowed to have someone who has viewed this videotape go through and explain, who is an expert in body language and the development of Brian Mitchell. Go through and—when it becomes the defense's turn to also go through and explain body language and the mechanisms that are going through the interview. What is good for the prosecution is good for the, defense, Judge.[26]

26. The defense had previously notified the trial court of its intent to call psychologist Wanda Draper as an expert in the first stage to help the jury "interpret Brian's attitude and analyze his body language during the tape." Tr. Trans., p. 1168. The trial court indicated its concern that Ms. Draper would be called "to do what the jury is going to do." Tr. Trans., p. 1169. Thereafter, the following discussion took place:

> MR. ROWAN: No. We're not going to ask her did Brian do this killing. But certainly, we're going to give the jury some help with motivation for persisting in these lies. John Maddox himself said you're disassociating this and this is the darndest case I've ever seen. He was totally frustrated and we would like to have an explanation as to why.
> THE COURT: Jim, you'll have to show me some authority for that because I don't know if there is any to do that now. The psychiatrist can't sit out here and watch people testify and get up here and testify about what they notice about the witnesses, et cetera because I need authority to allow the defendant to do that.
> Because what you are asking me to do is allow the third person to get on the stand in the defense of the case and interpret what the defendant was doing when actually that is the jury's responsibility. That's like a

news commendation author does when somebody says something on television and telling you what they said.
> MR. ROWAN: John Maddox has done that for his entire testimony. He is interpreting and giving editorials every time. You know he has said, in my opinion he was not being truthful. Well—
> THE COURT: But he is not an expert psychiatrist and not retained for that function. Let me see authority to allow you to do that because that concerns me a great deal. I think that goes into the fact finding mission of the jury. That is what concerns me about that.
> MR. ROWAN: If a 16 year veteran of the police officer [sic] says in my opinion he was lying and he has made that statement.
> THE COURT: I understand but you're wanting to put somebody on to say why he was lying.
> MR. ROWAN: No. It's not going to be that concrete. We're going to say some of the things developmentally in Brian's makeup that makes him the kind of person who would tell lies like this. We're not going to say whether giving an opinion as to whether he is lying or not but developmentally, though, we want to know something about Brian as to who is this guy that's being interviewed, what is going on in his mind, what is his family background.
> . . . .

MR. DEUTSCH: We've not asked to explain body language or anything of that nature. What we have asked is where certain terms were used and what happened—my questions now are going into the blank portions.

Mr. Rowan, in his opening statement, referred to the defendant as being like a hostage in Vietnam, blinking the eyes. We must show the confession is voluntary. We have the burden of explaining what happened in that room.

THE COURT: I understand, Mr. Deutsch, but what you are also doing is asking this officer to interpret the thinking processes of this defendant and what is going on by watching his mannerisms and the behavior of the defendant during the course of the interview.

MR. DEUTSCH: That's taken a little bit out of context. What I asked him was, was there anything that he said— that was my next question was going to when this officer says disassociation what does he mean by that term.

After that, Your Honor, I'm going into the blank section on the tape to explain—to lay a predicate for the second—introduction of the second tape. Again, I'm aware of no law, and if counsel has any, that would prohibit this type of testimony. It's certainly relevant.

MR. ROWAN: Your Honor, I think the question of Mr. Maddox about mood changes and, you know, the various interpretations of how he was thinking. So certainly that opens the door in order to further testimony along those lines.

MR. DEUTSCH: If I may, the defense brought this up in their opening statement. We certainly—

THE COURT: I overruled the objection, Mr. Deutsch.

(WHEREUPON, the bench conference was concluded; after which the following proceedings were had with the defendant and all parties present in open court:)

. . . .

Q: My question was you used the term disassociation two or three times. What does that refer to?

A: Disassociation is when someone tells you about an incident they have been involved in but they are telling it like they are watching someone else participate in it.

Q: We—at one point we hear the word they. The defendant says why did they kill her when you're out of the room. Is that what you're referring to?

A: Yes, sir, it would be.

Tr. Trans., pp. 1174–1177.

Petitioner argues that Maddox's testimony constituted an improperly admitted clinical diagnosis, as well as Maddox's opinion that Petitioner was guilty of the acts charged. The testimony undermined Petitioner's defense that, although he participated in the assault on the victim, he did not actually kill her. Petitioner argues he was denied the fair trial to which he is guaranteed by the Constitution as a result of the trial court's erroneous rulings.

***Procedural Bar.*** Respondent again elects not to address the merits of Petitioner's claim of error in the admission of Maddox's testimony. Instead, Respondent

THE COURT: I have to have some authority to do that. I have difficulty with you doing that in the first stage.
Tr. Trans., pp. 1169–1171. Defense counsel then indicated a desire to make an offer of proof "going through [Wanda Draper's] entire testimony as to what she would say." Tr.

Trans. p. 1171. Such an offer of proof was later made, and the trial court reaffirmed its decision to prohibit Wanda Draper from testifying during the first stage to rebut Maddox's "disassociation" testimony. Tr. Trans., pp. 1301–1307.

rests his argument on a claim of procedural bar. The Oklahoma Court of Criminal Appeals did not apply a procedural bar in this case. The court rejected the merits of Mitchell's argument by stating Mitchell's "contention is unpersuasive." *Mitchell*, 884 P.2d at 1197. The court went on to say that, "even if [the argument] had merit," it was not properly preserved by an objection during trial. *Id.* The court later stated "[a]s the trial court noted, Maddox was not offering [his] opinions as expert aids to the jury. Maddox's testimony was not error . . . ." *Id.*

The state court did not decline to address Mitchell's claims because he failed to meet a state procedural requirement, as is required for the application of the procedural bar rule. *See, Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

■ *Maddox's "Disassociation" Testimony.* The availability of habeas relief based on evidentiary rulings made by the trial court is very limited. In order to merit relief based on the trial court's evidentiary rulings, Petitioner must show that, "because of the court's actions, his trial, as a whole, was rendered fundamentally unfair." *Lujan v. Tansy* 2 F.3d 1031, 1033 (10th Cir.1993) (citing *Tapia v. Tansy*, 926 F.2d 1554, 1557 (10th Cir.1991)). Therefore, this Court's role in reviewing Petitioner's claim is to determine whether the claimed error resulted in "fundamental unfairness so as to constitute a denial of due process of law." *Martin v. Kaiser*, 907 F.2d 931, 934 (10th Cir.1990).

■ Maddox's statements to and discussion with Mitchell regarding disassociation, which were heard by the jury when the video tapes were viewed, are not particularly conspicuous. This is especially so when the statements are taken in context of the entire interrogation. The closer question, though, is the trial court's ruling which allowed Maddox to testify that, when Mitchell was alone in the interrogation room and stated "why did they kill her," he was actually relating an incident in which he was involved, but was telling it as though someone else did it.[27] While the trial court's ruling in this regard was ill-advised, this Court cannot say that the jury's receipt of Maddox's testimony regarding disassociation rendered the trial, as a whole, unfair. The testimony does not undermine this Court's confidence in the jury's verdict. *See, Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (a fair trial is "a trial resulting in a verdict worthy of confidence"). This is so, even in light of the trial court's exclusion of Mitchell's proffered rebuttal testimony, which is discussed below.

The Oklahoma Court of Criminal Appeals' decision in this regard was not in square conflict with Supreme Court precedent which is controlling on law and fact and did not rest upon objectively unreasonable application of Supreme Court precedent to new facts. *LaFevers, supra.* Habeas relief on this ground is denied.

*The Trial Court's Refusal to Allow Testimony to Rebut Maddox's "Disassociation" Testimony.* After the trial court allowed Maddox to testify regarding his theory of "disassociation," the court refused to allow the defense to call Dr. Wanda Draper as a rebuttal witness. Dr. Draper was prepared to testify that the reason for Mitchell's behavior during the videotape interrogation could have been his desperation in attempting to cover for someone else. This theory would explain why Mitchell gave several different versions of what occurred, and why his story changed each time the police officers gave him additional information. Dr. Draper

---

**27.** See the quoted testimony at page 1218, above.

was prepared to contradict Maddox's testimony that Mitchell was lying. Tr. Trans., pp. 1301–1306.

As with the trial court's decision to allow certain evidence to reach the jury, it is very difficult for a habeas petitioner to obtain habeas relief based on the trial court's decision to exclude evidence during trial. Again, the standard is whether the trial court's decision rendered the trial, as a whole, fundamentally unfair. *Tapia v. Tansy,* 926 F.2d 1554, 1557 (10th Cir.1991). This Court must determine whether the exclusion of Dr. Draper's testimony was "an error of constitutional dimension, and whether that constitutional error was harmless beyond a reasonable doubt." *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988) (citing *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)); *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983). "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial." *Maes v. Thomas,* 46 F.3d at 987 (citing *Rosario).*

In *Rosario,* the Second Circuit Court of Appeals analyzed this materiality requirement by looking to the Supreme Court's decision in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs,* the Supreme Court analyzed the materiality of evidence which had been withheld by the prosecution and stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission

> must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evince is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2401–02 (footnotes omitted).

While the state courts' decision in the present case that Dr. Draper's testimony "would have infringed on the jury's responsibility" but Maddox's testimony did not is inexplicable, this Court cannot say that those decisions rendered Mitchell's trial fundamentally unfair. When the evidence which was properly presented at trial is considered as a whole, this Court cannot say that the omitted evidence would have created a reasonable doubt as to Mitchell's guilt. Nor can this Court say the Oklahoma Court of Criminal Appeals' decision was in square conflict with Supreme Court precedent which is controlling on law and fact, or that it rests on an objectively unreasonable application of Supreme Court precedent to new facts. *LaFevers, supra;* 28 U.S.C. § 2254(d)(1)(2). Habeas relief on this ground is therefore denied.

**F.** ***Sufficiency of Evidence to Support Sexual Assault Convictions and State's Failure to Produce Exculpatory Evidence.***

Petitioner claims, in his sixth ground for relief, the evidence introduced at trial in support of the claims of rape and forcible anal sodomy was insufficient to support his conviction of those crimes. In his nineteenth ground for relief, Petitioner claims he recently discovered exculpatory evidence which further calls into question his sexual assault convictions and the credibili-

ty of certain witnesses.[28] Respondent did not respond to Petitioner's nineteenth ground for relief.

Mitchell claims the failure to disclose exculpatory evidence violated the Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and subsequent Supreme Court decisions interpreting and applying *Brady.* An evidentiary hearing regarding this claim was held on August 6, 1999.

**The Oklahoma Court of Criminal Appeals' Decision.** On Mitchell's direct appeal, the Oklahoma Court of Criminal Appeals held:

> Mitchell argues the evidence of rape and anal sodomy was insufficient because the state failed to prove the element of penetration. To support a conviction for rape or anal sodomy, the State must prove even slight penetration.[29] This Court will not disturb a verdict where, reviewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[30] Where a case is based on circumstantial evidence, that evidence must exclude every reasonable hypothesis except that of guilt.[31] This Court will accept all reasonable inferences and credibility choices supporting the jury verdict.[32]

The medical examiner found no trauma and no sperm on the vaginal or rectal swabs; neither the FBI nor Wraxall of the Serological Research Institute found sperm on the vaginal or rectal swabs; Joyce Gilchrist found small amounts of sperm on both vaginal and rectal swabs. Mitchell essentially claims that the evidence is insufficient because Gilchrist's findings and testimony cannot be trusted and are not corroborated.[33] This Court cannot distinguish between Gilchrist's veracity and that of other experts. Gilchrist's findings indicated the presence of sperm in the vaginal and anal canals (the latter consistent with Mitchell). Sperm consistent with Mitchell was also found on the medical examiner's transport sheet in the area where Scott's genitals lay during transport. A jury could reasonably infer that even slight penetration was necessary for sperm to be found in both canals, and the evidence was sufficient to support these convictions.

*Mitchell,* 884 P.2d at 1199.

**The Testimony and Evidence at Trial.** Ms. Scott was found face-down on the floor of the office in the Center, unclothed except for socks on her feet. Tr. Trans., p. 871–72; St. Ex. 61. During trial, Petitioner testified that he masturbated in Ms.

---

**28.** This Court notes that Petitioner sought leave to amend his petition by motion filed on May 22, 1998. Leave was granted, and Petitioner's *Additional Ground for Relief (Ground Nineteen)* was filed, on May 26, 1998.

**29.** 12 O.S.1991, §§ 886, 887, 1113; *Vaughn v. State,* 697 P.2d 963 (Okl.Crim.App.1985).

**30.** *Spuehler v. State,* 709 P.2d 202, 203–204 (Okl.Crim.App.1985).

**31.** *Mayes v. State,* 887 P.2d 1288 (Okl.Crim. App.1994).

**32.** *Maxwell v. State,* 742 P.2d 1165, 1169 (Okl. Crim.App.1987).

**33.** Mitchell suggested at trial that semen and body fluids could travel downwards while the body was at rest in order to explain the presence of sperm and indications of seminal fluid on the rectal swab. However, Scott was found lying face down.

[This Court notes, however, that the rectal swab was taken the day after Ms. Scott was murdered, after the body had been wrapped in a sheet and transported to the morgue for examination and autopsy. Tr. Trans. 874, 891. There was no evidence at trial as to whether the body was face up or down during transport and while it lay at the morgue overnight.]

Scott's presence, while she was still alive. Tr. Trans. at 1264. He denied any sexual contact with her. *Id.* at 1264–65, 1286.

Dr. Larry Balding, deputy medical examiner for the State of Oklahoma, testified during trial regarding his examination of the murder scene and Ms. Scott's body. Although a medical examiner does not normally go to the scene of a murder, Dr. Balding was called to the scene in this case because it was "a particularly ... interesting and unusual scene and crime." *Id.* at 870. After the body was examined at the scene, it was wrapped in a white sheet and taken to the medical examiner's office for a more complete exam. *Id.* at 872–73.

On the evening of January 7, 1991, Dr. Balding took vaginal swabs to look for any evidence of sperm. He saw none. *Id.* at 873. The next day, a complete autopsy was done and a swab of the rectum was taken at that time. *Id.* at 874, 891.[34] Dr. Balding saw nothing that looked like sperm, semen or ejaculate in the pubic or vaginal region, but did pubic combings for further testing. *Id.* at 875, 892, 898–99. The swabs and combings were then sent to the Oklahoma City Police Department for testing, along with the sheet on which the body had been transported. *Id.* at 891–92, 979, 995–96.

According to Dr. Balding, anything that was in the vagina of a dead rape victim might flow out of the vagina and into the rectal area, depending upon many factors, such as the position of the body. *Id.* at

900. Dr. Balding also testified regarding the injuries sustained by Ms. Scott. He observed no vaginal or anal trauma in his examination. *Id.* at 898. He found areas of bruising around both hip bones, which he determined was caused by some form of blunt trauma. *Id.* at 885–86. "It could have been from a hand resting there, a blow there, a knee hitting there. And it certainly could have occurred in the course of a rape or sexual activity." *Id.* at 886. Dr. Balding could not say "with any certainty" what caused the bruising. *Id.*

Joyce Gilchrist, a forensic chemist employed by the Oklahoma City Police Department, also testified regarding the evidence of rape and sodomy in this case. Gilchrist tested various specimens from the crime scene and compared them with samples obtained from Mitchell, Phillip Taylor,[35] and Michael Harjochee.[36] Gilchrist conducted ABO blood typing and electrophoresis, which breaks the blood into its enzymes, to further narrow the class of persons from whom the specimens could have come. *Id.* at 985. While the methods used by Gilchrist can never positively identify the person from whom a particular specimen came, the testing can positively eliminate people and can determine whether a sample is consistent with a person. *Id.* at 986.

Gilchrist examined the swabs forwarded to the Police Department by the Medical Examiner's office. She found no acid phosphatase on the vaginal swab, but was able to identify six (6) sperm.[37] *Id.* at 990–

---

**34.** Dr. Balding did not testify as to his observations of the rectal swab, although it is implied throughout his testimony that he did not find sperm on the rectal swab. During his questioning of Joyce Gilchrist, the assistant district attorney also indicated that Dr. Balding found no sperm on the rectal swab. *Id.* at 992.

**35.** Phillip Taylor testified during trial that he and Ms. Scott were "boyfriend/girlfriend" and had been dating over a year. Tr. Trans. at

781. He further testified that he had last had sexual intercourse with Ms. Scott eight (8) days before her death. *Id.*

**36.** Michael Harjochee was also dating Ms. Scott at the time of her death. *Id.* at 735.

**37.** Gilchrist received four vaginal swabs from the Medical Examiner's office. *Id.* at 978. She found sperm on only one swab. *Id.* at 991.

91. Gilchrist testified that the absence of acid phosphatase meant the "seminal fluid drained out." *Id.* at 990. She was unable to determine any possible donor of the six sperm. *Id.* at 992.

On examination of the rectal swabs, Gilchrist found acid phosphatase and ten (10) sperm. *Id.* Gilchrist was able to determine that the person who donated these sperm had a blood type the same as Petitioner and Taylor. *Id.* at 993.

Likewise, with regard to the pubic combings, Gilchrist testified that her findings were consistent with the blood types of both Petitioner and Taylor. *Id.* at 994. She also found blood, semen and sperm on the sheet on which Ms. Scott's body was transported. *Id.* at 996–97. These specimens were consistent with both Petitioner and Taylor, as well. *Id.* Further, Gilchrist identified and tested semen stains on the crotches of Ms. Scott's panties and jeans and the back of Ms. Scott's panties. She testified the sperm she found were consistent with both Petitioner and Taylor. *Id.* at 1000–1001, 1028–29. Gilchrist found two semen stains on the right sleeve of Ms. Scott's shirt which were consistent with both Petitioner and Taylor. *Id.* at 1002. She also found semen on the left sleeve of the shirt, but was unable to test it. *Id.*

Gilchrist forwarded eleven (11) items of evidence for further testing to Special Agent Michael Vick in the FBI laboratory DNA unit. *Id.* at 1008. The evidence sent to Agent Vick included two and one-half vaginal swabs, one and one-half rectal swabs, cuttings from a flat sheet, and a cutting from the panties. *Id.* The FBI prepared a report regarding its testing of these items. The pertinent portion of the FBI report reads as follows:

> No DNA profile results or no DNA profile results unlike the [dried blood] sample from the victim or the [dried blood] sample from the victim's boyfriend were obtained for specimens Q2 [vaginal swab], Q4 [rectal swab], or Q8 [cutting from panties] due to insufficient and/or degraded DNA; therefore, no comparisons could be made with the known specimen from the suspect.
>
> Preliminary testing indicated [the cuttings from the flat sheet] did not contain sufficient high molecular weight DNA for further analysis.

*Id.* at 1032–33, Appendix C to Petitioner's *Additional Ground for Relief;* Petitioner's Ex. 2, Evid. Hearing. At trial, Gilchrist testified during direct examination:

> Q: (By Mr. Deason) Ms. Gilchrist, do you know whether the FBI DNA analysis was able to associate any of this evidence to the defendant in this case?
>
> A: No, they were not able to.
>
> Q: Would it be correct to say the results were inconclusive?
>
> A: Yes.

*Id.* at 1008–1009.

On cross-examination, Gilchrist testified:

> Q: You testified that this FBI report received from Michael Vick at the FBI DNA lab was inconclusive, right?
>
> A: In reference to your client, yes.

*Id.* at 1032.

Gilchrist also sent evidence to Mr. Brian Wraxall at the Serological Research Institute in Richmond, California, including remnants of a vaginal swab, remnants from rectal swabs, a rectal swab eluate, cuttings from panties, a pubic comb stain, and a flat sheet stained cutting. *Id.* at 1009–1010. She also sent her sperm slides to Wraxall for review. *Id.* at 1010.

Most of the evidence Wraxall received either had such a small amount of semen that he was unable to do further testing or he was unable to confirm the presence of

semen at all.[38] *Id.* at 1096–98. He could, however, confirm the presence of spermatozoa which was consistent with Petitioner and inconsistent with Taylor on the flat sheet and on a pubic hair sample. *Id.* at 1099–1101.

Defense counsel questioned Wraxall regarding the FBI report, as well. When counsel asked Wraxall if he could "read that FBI report and tell us what it means," Wraxall replied:

> With a little difficulty because it's not real clear in terms of what they're saying the results are. Basically, the important sentence says, no DNA profile results or no DNA profile results unlike the K–1 sample which would have been the dried blood sample from Elaine Scott were obtained for or—excuse me, or the K–3 sample which is the dried blood sample from Phil Taylor.

*Id.* at 1106–1107. Defense counsel went on to ask whether the FBI agent, in the report, is saying "he saw some of these bar graphs or bar codes for Elaine Scott and Phil Taylor?" *Id.* at 1107. Wraxall responded, "That's what I—you can read into that." *Id.* At that point, the prosecution objected, claiming the questioning called for speculation as to what the FBI

agent saw. The trial court sustained the objection. *Id.*

In further questioning, defense counsel asked Wraxall if the FBI report was helpful in his analysis of the evidence. Wraxall responded, "Only to indicate that something has been done before. I mean, it doesn't tell me very much other than they didn't get anything." *Id.* at 1108.

According to Gilchrist's trial testimony, a viable semen or sperm sample would be present within a female's body for up to twelve hours after intercourse if the person is up and moving around. *Id.* at 1027. Gilchrist testified that she would not expect eight-day-old semen to be found in a body. *Id.*

***Recently Discovered Evidence.*** Petitioner requested, and was granted, discovery in the present habeas proceeding. As a result of that discovery, Petitioner obtained hand-written notes taken by Gilchrist, dated 4/10/91, 5/1/91 and 5/3/91. The 4/10/91 and 5/3/91 were taken during telephone conversations with Agent Vick. Gilchrist's 4/10/91 notes include a notation that Agent Vick had completed two (2) probes on the DNA samples[39] and the statement "Match—Taylor (Panties) + Vic".[40] The notes further indicate the FBI

---

**38.** In fact, Mr. Wraxall testified he examined Gilchrist's rectal swab slide which was presented to him as containing ten (10) sperm and found none. He examined the eluate from the rectal swab and found no sperm. He examined a slide containing a sample obtained from the crotch of Ms. Scott's jeans, which was presented to him as containing spermatozoa and found none, even after doing further extraction and testing. *Id.* at 1103–1105. He further testified that spermatozoa are fairly hardy and "you can find spermatozoa on a stain 10 years old without too much trouble."

**39.** As explained below, Agent Vick conducted four probes (analyzed four genetic addresses) on the DNA samples he tested. Therefore, at the time he had the conversation with Gil-

christ on April 10, 1991, his testing was incomplete. *See,* Trans., 8/6/99 Evid. Hearing, p. 93. The FBI's testing was complete when Gilchrist and Agent Vick spoke on May 3, 1991. *Id.* at 93–94.

**40.** During the evidentiary hearing, Gilchrist testified that, while she had no independent recollection of the details of her conversation with Agent Vick, she knows her note means that Agent Vick's testing revealed that the fluids on Ms. Scott's panties were "consistent with" Taylor and Ms. Scott (Vic or victim). The word "match" was "my word," according to Gilchrist, and was not the word used by Agent Vick in their conversation. Trans., 8/6/99 Evid. Hearing, pp. 128, 130, 149–50, 156.

was unable to find DNA on the rectal swab. The May 3, 1991 notes include the following:

Done!

Vag swab → c/w E. Scott

Panties → c/w Taylor [41]

App. A, Petitioner's *Additional Ground for Relief;* Petitioner's Ex. 5, Evid. Hearing.

***Evidentiary Hearing.*** Due to the seriousness of the allegations contained in Mitchell's nineteenth ground for relief,[42] and because Respondent's failure to respond to those allegations left them unrefuted, the Court held an evidentiary hearing on August 6, 1999. Exhibits were received into evidence and the testimony of four witnesses was presented. The petitioner presented Dr. Robert Allen, director of the Laboratory for DNA and HLA Typing with the H.A. Chapman Institute of Medical Genetics in Tulsa, Oklahoma and Jim Rowan, who was Mitchell's trial counsel. The respondent presented Special Agent Michael Vick, who was a member of the FBI's DNA analysis unit in 1991 and 1992, and Joyce Gilchrist.

According to both Dr. Allen and Agent Vick, Restriction Fragment Length Polymorphism (RFLP) DNA analysis is done in two stages. The first stage is a visual comparison of the autoradiographs derived from the various samples being compared.[43] The scientist visually compares the location of the bands from the known DNA on the autoradiograph with the location of the bands from the sample or unknown DNA. Trans., 8/6/99 Evid. Hearing, pp. 24, 95–96.

The second stage of testing is a mathematical procedure called sizing or measuring. In sizing the samples, the scientist plots the locations of the bands to make sure they are indeed the same size and at the same point on the autoradiograph. *Id.* Both Dr. Allen and Agent Vick testified they would not declare a DNA "match" unless they had confirmed the visual match through sizing. Trans., 8/6/99 Evid. Hearing, pp. 47–48, 51, 96, 104.

The analysis done by Agent Vick on the four DNA fragments from each sample was a visual comparison only. *Id.* at 97; Petitioner's Ex. 1A–1H, Evid. Hearing. Agent Vick compared samples from the vaginal swabs, rectal swabs and Ms. Scott's panties to samples obtained from Ms. Scott, Petitioner, Taylor and Harjochee. *None* of Agent Vick's testing revealed the presence of Petitioner's DNA in the unknown samples. Trans., 8/6/99

---

**41.** Gilchrist's testimony during the evidentiary hearing confirmed that these notes mean that the DNA obtained from the vaginal swab was consistent with Elaine Scott and the DNA obtained from the panties was consistent with Phillip Taylor. Trans., 8/6/99 Evid. Hearing, p. 130.

**42.** Petitioner's allegations in support of his *Brady* claim were that the State had evidence of FBI testing which revealed a DNA match with a person other than Petitioner, but did not produce that information prior to trial, and that Joyce Gilchrist gave misleading and/or untruthful testimony regarding this evidence during trial.

**43.** The autoradiographs discussed during the evidentiary hearing are images on photographic film, much like x-rays, which look somewhat like a bar graph. Agent Vick developed eight (8) autoradiographs, using four different DNA fragments, or DNA addresses, from each known sample of Ms. Scott, Taylor, Harjochee and Petitioner and each of the unknown samples. After significant processing, DNA fragments, or bands, of the same size will locate in a specific place on the bar graph, thereby revealing a match. Trans., 8/6/99 Evid. Hearing, pp. 20–24. More than one DNA fragment from each sample is analyzed because there is a chance that more than one person will share a single band of DNA, but the chance that two people will share all or part of their DNA profile is much smaller. *Id.* at 26–27. Dr. Allen testified that a match on four addresses will typically yield odds "in the millions to one as the source of the stain." *Id.* at 37.

Evid. Hearing, pp. 98, 100, 119. Taylor's DNA was present on at least three of the tests run on the sample from Ms. Scott's panties.[44] Petitioner's Exhibits 1A–1H, Evid. Hearing. Because Taylor was Ms. Scott's boyfriend, his DNA was presumed to be present as the result of a consensual encounter. As the only DNA foreign to Ms. Scott visually matched the DNA of her boyfriend, and not the "suspect," Agent Vick, did not size his results. Trans., 8/6/99 Evid. Hearing, p. 96–97. Because he did not size his results, he could not declare a "match" to Taylor's DNA. Agent Vick did not, however, think that sizing would have provided any relevant information in this case. Had he conducted the sizing, the wording of his report might have been a little different, but the meaning would have been the same. *Id.* at 108–109.

Agent Vick admits that there is no way to tell from his report that: (1) he obtained no DNA profile results from the rectal swabs; (2) he obtained no DNA profile results unlike the victim for the vaginal swabs; and (3) he obtained no DNA profile results unlike the victim or Taylor for the panties. *Id.* at 118. According to Agent Vick, the report says that the profiles he found matched Ms. Scott and Taylor. Agent Vick testified that is why there were

no other profiles which could be compared against Mitchell's DNA. *Id.* at 119. Agent Vick claims his statement that there were no profiles which could be compared to Mitchell constitutes a specific statement that Mitchell's DNA was not found in the FBI testing. *Id.* at 121.

The reliance of Respondent and his witnesses on their own technical interpretation of the term "match" and DNA test results and FBI report to justify the State's blatant withholding of unquestionably exculpatory evidence is absolutely indefensible. Gilchrist's trial testimony that the DNA analysis performed by the FBI was "inconclusive" "as to [Petitioner]" was, without question, untrue. Over a year before Petitioner was tried and convicted of rape and anal sodomy, Agent Vick's DNA testing revealed that *Petitioner's DNA was not present on the samples tested.*

Petitioner's trial counsel did not receive copies of the autoradiographs developed by Agent Vick. *Id.* at 142. Petitioner's trial counsel did not receive copies of Gilchrist's notes, which demonstrate that she, too, was confident that only Ms. Scott's DNA was present on the vaginal swab and that only Ms. Scott and Taylor's DNA was present on the panties.[45] Instead, the prosecution turned over only the formal FBI report discussed above which, *at best,* is unclear and ambiguous.[46]

---

**44.** Only Ms. Scott's DNA was present on the vaginal swabs, while no DNA was revealed from the rectal swabs. Trans., 8/6/99 Evid. Hearing, pp. 94, 103; Petitioner's Ex. 1A–1H, Evid. Hearing.

**45.** There is an indication in the trial transcript that Jim Rowan, Mitchell's trial counsel, was, in fact, aware that Taylor's DNA was found by the FBI. In argument to the trial court regarding a motion in limine filed by the prosecution, Rowan stated "we do have a match with Phil Taylor made by the FBI." Tr. Trans., p. 7. Because the explanation provided by Rowan during the evidentiary hearing is entirely inconsistent with the dialogue in the transcript surrounding the statement itself (Trans., 8/6/99 Evid. Hearing, pp. 80–83), this

Court must take the statement at face value. However, having thoroughly reviewed the complete trial transcript and the testimony and evidence presented during the evidentiary hearing, this Court is of the opinion that, even if the defense might have surmised that the FBI found a DNA match with Taylor, the defense was not aware that the FBI's DNA testing revealed the critical fact that Mitchell's DNA was not present on the samples tested.

**46.** Although Agent Vick testified that it is clear from the report provided to the defense that Mitchell's DNA was not revealed in the FBI testing (Trans., 8/6/99 Evid. Hearing, p. 121), this Court disagrees and further notes that, as discussed below, both Wraxall and

Just as troubling to this Court is the fact that the State labored extensively at trial to obscure the true DNA test results and to highlight Gilchrist's test results, which admittedly have a much lower degree of certainty than the DNA testing.[47] Gilchrist testified at trial that the results of her blood tests were consistent with both Taylor and Mitchell.[48] While the only foreign DNA found was consistent only with Taylor, the prosecution emphasized Gilchrist's test results and told the jury the DNA testing was "inconclusive." At the same time, the prosecution withheld the true facts from the defense, thereby preventing effective cross-examination. This fact is highlighted by the cross-examination of Wraxall, the prosecution's witness, during trial. When he was questioned about the DNA testing, he testified that he understood the FBI report to mean that the FBI "didn't get anything."[49]

In closing argument, the prosecution capitalized on the FBI report and placed its own twist on the report. The prosecu-

tion told the jury there were no DNA results because the testing was "inconclusive" because of "low molecular weight and degraded sample of DNA."[50] It is clear that this statement is entirely unsupported by evidence and is misleading—the prosecution had DNA results which excluded Mitchell as the donor of the samples tested. The prosecution went on to emphasize "the semen, sperm on Elaine Scott ... associated with the defendant and Phil Taylor," Phil Taylor's "uncontroverted testimony that he had had sex with Elaine Scott eight days prior to that," and "Joyce Gilchrist's testimony that in her opinion semen, sperm couldn't survive that long in Elaine Scott's body." *Id.* at 1350–51. Again, in light of the knowledge held by Gilchrist, the FBI and the prosecution, this argument is absolutely untenable.

***Federal Law, as Determined by the Supreme Court.*** Application of relevant precedent to the facts of this case reveals that Petitioner should prevail.

---

the Oklahoma Court of Criminal Appeals did not understand from the report that the DNA found by the FBI was not Petitioner's or that Petitioner's DNA was not revealed in any of the testing done.

**47.** Trans., 8/6/99 Evid. Hearing, p. 141.

**48.** Gilchrist's testimony during the evidentiary hearing indicated that even this testimony was, at least, misleading. During the evidentiary hearing, Gilchrist testified that her PGM subtyping *excluded* Mitchell as the donor of the samples she tested. Trans., 8/6/99 Evid. Hearing, pp. 143–46. Gilchrist never indicated at trial that Mitchell was excluded by the PGM subtyping, but, to the contrary, consistently testified that her testing revealed that both Mitchell and Taylor could be the donor of the samples she tested. Although Respondent attempted to elicit testimony from Gilchrist to show that her answers at trial were consistent with her testimony during the evidentiary hearing, it does not seem to this Court that the answers can be consistent. If Mitchell was *excluded* by the PGM subtyping, Gilchrist's findings simply could not be con-

sistent with both Mitchell and Taylor. In addition, Dr. Allen testified unequivocally that Gilchrist's PGM analysis excluded Mitchell as a contributor of all of the specimens tested. *Id.* at 39. According to Dr. Allen, the only conclusion that can be drawn from Gilchrist's results is that Mitchell is excluded. *Id.* at 39–40.

**49.** Significantly, the Court of Criminal Appeals also misunderstood the State's evidence regarding the donor of the semen on Ms. Scott's panties, based on its review of the record and arguments on appeal. The Court of Criminal Appeals stated "sperm consistent with Mitchell was on Scott's panties." See, footnote 11, *supra.* As it turns out, this· is untrue.

**50.** The prosecutor asked the jury to "[r]ecall if you will ... that the FBI results while they were certainly inconclusive and you heard why, low molecular weight and degraded sample of DNA." Tr. Trans., pp. 1338–39.

In *Brady*, the Supreme Court announced the principle that the prosecution may not suppress evidence favorable to the accused which is material either to guilt or punishment, when the accused requests the information.[51] 373 U.S. at 86, 83 S.Ct. at 1196–97. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court noted that suppression of evidence is a constitutional violation only if it deprives the defendant of a fair trial. "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. at 3381. *See also, United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court went on to say:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

> [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the 'favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'

*Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490, (1995)) (internal citations and quotations omitted).

■ The fact that the undisclosed evidence was within the control of Gilchrist and the FBI, rather than the district attorney, is of no consequence in this case. Even if the prosecutor did not know of the exculpatory information,

> the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith ...), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. at 437–38, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490.

■ There is no doubt that the prosecution's failure to provide the DNA evidence linking Taylor to the semen on Ms. Scott's panties, and revealing that Petitioner's DNA was not found in any of the samples tested, could reasonably have placed the State's case on the rape and sodomy charges in "such a different light as to undermine confidence in the verdict."

---

**51.** Although Petitioner unquestionably requested information such as Gilchrist's notes, such a request is no longer required. The Supreme Court held in *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) that the prosecution has a duty to disclose exculpatory evidence even if it has not been requested. This extension of the *Brady* rule is important in light of Gilchrist's statement that the autoradiographs, which might have at least given the defense a way to interpret the FBI report, were not provided to the defense because she was not asked for them and she does not turn over anything unless she is "under a court order to give them up" (Trans., 8/6/99 Evid. Hearing, p. 142), and in light of Agent Vick's insistence that Petitioner's defense counsel should not have been confused by his report because the defense should have contacted Agent Vick to learn the true meaning of his report (Trans., 8/6/99 Evid. Hearing, pp. 120–21).

Gilchrist's testimony that the DNA tests on the semen were "inconclusive," or "inconclusive as to" Petitioner, was, at least, misleading. When she testified at trial, Gilchrist knew the semen on Ms. Scott's panties was not consistent with both Petitioner and Taylor. She knew the semen was at least a preliminary match for Taylor *and* that Petitioner's DNA had *not* been found on the panties. Thus, the DNA test results were far from inconclusive.

This evidence undermines this Court's confidence in the jury verdict on the rape and sodomy charges in several respects. Of course, it calls into question the reliability of Gilchrist's testimony.[52] It also makes Taylor's testimony that he last had sexual intercourse with Ms. Scott eight days before her death questionable. It tends to indicate that the many samples described above which were tested by Gilchrist and found to be consistent with both Petitioner and Taylor are at least as likely, if not more likely, to be attributable to Taylor rather than to Petitioner.[53]

With regard to Petitioner's sufficiency of the evidence claim, it is axiomatic that proof of guilt beyond a reasonable doubt is an essential element of Fourteenth Amendment due process. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This standard has been met if, when the evidence is viewed in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See also, Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir.1995).

This Court acknowledges that the evidence presented at trial, when viewed in the light most favorable to the prosecution, probably meets the *Winship* standard. At the same time, however, this Court is cognizant of the fact that the evidence presented at trial was terribly misleading, if not false. The jury did not receive a truthful representation of the evidence on the rape and sodomy charges due to constitutional violations by the State. It is therefore this Court's opinion that the

---

**52.** This Court, having received Gilchrist's testimony during the evidentiary hearing, having observed her demeanor and conduct, and having compared her trial testimony with the facts revealed during the evidentiary hearing, also notes the often-cited criticisms of her by the Oklahoma Court of Criminal Appeals. *See, McCarty v. State*, 765 P.2d 1215, 1217–19 (Okla.Crim.App.1988) (Gilchrist's delay in disclosing hair evidence to the defense was "inexcusable" and deprived defendant of fair trial. Gilchrist's report regarding her examination of evidence was "at best incomplete, and at worst inaccurate and misleading." The significant omission, "whether intentional or inadvertent, resulted in trial by ambush." Gilchrist gave improper opinion which she was unquestionably unqualified to give and which was not supported by the state of the art of forensic science; court noted conclusion of Southwestern Association of Forensic Scientists, Inc. that Gilchrist had violated ethical code.); *Fox v. State*, 779 P.2d 562, 571–72 (Okla.Crim.App.1989) (Gilchrist

testified to a conclusion which was not scientifically supported.); *Pierce v. State*, 786 P.2d 1255, 1261 (Okla.Crim.App.1990) (Gilchrist violated trial court's order to forward evidence to laboratory designated by defense.); *Miller v. State*, 809 P.2d 1317, 1319–20 (Okla. Crim.App.1991) (Gilchrist did not transmit evidence to defense expert until two weeks after court-ordered deadline and six and one-half days before trial. Gilchrist's report omitted crucial conclusion. The significant omission, together with State's extreme tardiness in complying with discovery order, "resulted in trial by ambush on a very critical piece of evidence.")

**53.** Likewise, Petitioner's testimony that he ejaculated in Ms. Scott's presence, but did not rape her, is consistent with the unchallenged evidence of sperm attributable to Petitioner being found on Ms. Scott's clothing and in the public combings, but not in the other evidence discussed herein.

*Winship* standard could not be met if the jury had been given an accurate picture of the facts.

The circumstances which led to Petitioner's conviction for rape and sodomy—the prosecution's failure to produce Gilchrist's notes, the autoradiographs, and the complete test results to the defense in this case, as well as the misleading testimony and evidence presented during trial—undermines this Court's confidence in the jury's verdict on the rape and sodomy charges. Habeas relief on Petitioner's *Brady* claim is therefore granted.

■ *Effect on the Death Sentence.* Petitioner strenuously argues that the constitutional error in connection with the rape and sodomy convictions must also result in habeas relief being granted and the death sentence being vacated. This Court disagrees. The jury had sufficient evidence to justify its conclusion that the three aggravating circumstances it found were present, even without the rape and sodomy convictions. *See Romano v. Oklahoma,* 512 U.S. 1, 13, 114 S.Ct. 2004, 2011, 129 L.Ed.2d 1 (1994); *see also Cannon v. State,* 904 P.2d 89, 102–103 (Okla.Crim. App.1995) (Oklahoma Court of Criminal Appeals reversed rape and anal sodomy convictions due to insufficient evidence but affirmed the death sentence, concluding that the evidence was sufficient to support the aggravating circumstances in the absence of the rape and sodomy convictions).

Given the horrific nature of the assault on Ms. Scott prior to her death, including the evidence of struggle which was introduced at trial,[54] there is absolutely no question that the heinous, atrocious and cruel aggravator is well-supported in this case. Given the fact that Mitchell had been released from the Rader Center, where he had been confined because he had raped a twelve-year old girl, for only sixteen days prior to his murdering Ms. Scott, the continuing threat aggravator is also well-supported in this case. Moreover, as fully discussed elsewhere, the jury was justified in finding the killing to avoid arrest aggravator in light of Petitioner's robbery conviction.

There is absolutely no question that, even absent the rape and sodomy charges and convictions, this is an appropriate case for the death penalty. This Court's grant of the writ on the rape and sodomy charges will not affect the death sentence.

---

**54.** For example: Ms. Scott's clothes were laying beneath a bulletin board which had been knocked off the wall. Tr. Trans., pp. 858–59. The phone cord had been yanked from the phone so that the phone would not work. *Id.* at 836–37. Blood and brain matter were spattered around Ms. Scott's body, down her back, on the door frame and door, and six and one-half to seven feet up the wall. *Id.* at 797, 861–63, 872. According to the medical examiner, Ms. Scott's brain could be seen on external exam and the "brain was massively torn. There were a lot of wood ... splinters in the wound, in the hair. One of the wood splinters had literally been driven into the—through the brain and into the internal part of the skull. There was a massive skull fracture which ran across the skull from ear to ear on the inside part of the skull." *Id.* at 878. These wounds were caused by approximately four or five blows with a wooden coat tree. *Id.* at 878–79. Ms. Scott also had a laceration to her scalp which could have been made with a golf club which was found at the scene, broken. *Id.* at 879–80. In addition, Ms. Scott had various abrasions and lacerations to her face, as well as a fractured nose and chipped tooth, all caused by a blunt force such as a blow from the golf club. *Id.* at 880–81. There were also five puncture wounds around Ms. Scott's neck which could have been caused by a compass which was found beneath Ms. Scott's body. *Id.* at pp. 882–83. There were multiple bruises on her arms, left shoulder, knees, pelvic area and legs. *Id.* at 885–86. There were also scratches and abrasions on Ms. Scott's back and buttocks, as well as her fingers. *Id.* Finally, two of Ms. Scott's ribs were fractured. *Id.* at 887.

### G. Limitation on Cross Examination of Police Forensic Expert Joyce Gilchrist.

■ *Factual Background and the Oklahoma Court of Criminal Appeals' Decision.* In his seventh ground, Petitioner complains that he was unconstitutionally restricted in his cross examination of Joyce Gilchrist by the trial court's pre-trial ruling limiting the areas in which cross examination and impeachment would be allowed. The Oklahoma Court of Criminal Appeals reviewed this claim on direct appeal and held:

> In his tenth proposition Mitchell claims he was denied his Sixth Amendment right of confrontation by the trial court's refusal to permit counsel to impeach the State's forensic witness Joyce Gilchrist. Mitchell did not preserve this issue for appeal. The trial court sustained a pretrial motion in limine in which the State sought to prevent Mitchell from attacking Gilchrist with this Court's opinion in a previous case.[55] During the trial Mitchell neither brought the matter up on cross-examination nor made an offer of proof as to the evidence he wished to use. A motion in limine is advisory only and, to preserve the issue for appeal, a

party must make an offer of proof, attempt to introduce the disputed matter at trial, or object when the disputed evidence is introduced.[56]

Had the issue been properly preserved, Mitchell's argument would fail because he evidently misunderstood the scope of the trial court's ruling. The trial court prospectively barred Mitchell from impeaching Gilchrist by using the *McCarty* opinion. This Court's published comments concerning another case would appear to be of little or no value in Mitchell's trial. Clearly, the fact that Gilchrist had been censured by a professional organization is highly relevant and exactly the sort of evidence which would be of interest to a jury in determining her credibility. Nothing in the trial court's ruling prevented Mitchell from asking Gilchrist if she had been censured by a professional organization.

*Mitchell*, 884 P.2d at 1197–98.

The Court of Criminal Appeals' characterization of the proceedings in the trial court, and the court's ruling, is slightly inaccurate, as the trial court's ruling was not made on a motion in limine. The Court of Criminal Appeals is correct, however, in noting that the trial court's ruling was not as broad as the Petitioner now argues.[57] The trial court's pretrial ruling

---

55. *McCarty v. State*, 765 P.2d 1215 (Okl.Crim. App.1988) (this Court noted that the Southwestern Association of Forensic Scientists, Inc., censured Gilchrist in 1987 for unethical behavior).

56. *Luna v. State*, 829 P.2d 69, 71 (Okl.Crim. App.1992). . . .

57. The following exchange took place immediately prior to the beginning of jury selection:

> MR. DEASON: . . . . I would also like to advise the Court that we may have a motion in limine in regard to one of our first stage witnesses.
>
> Specifically, Joyce Gilchrist, we feel has been a tactic in the past to attack her based upon supposedly her having been chided by the Court of Criminal Appeals for member-

ship in a professional organization. We intend to file a motion in liminee [sic] to address that subject before Gilchrist is called.

> THE COURT: Let me address that issue right now. I don't need a motion in limine. The Court of Criminal Appeals' comments, regardless of what they think out there, are not going to be brought into the record for the purpose of this case because they are not of any necessity in this case and they are of no benefit in this case.
>
> I am very well aware of what the Court of Criminal Appeals have [sic] said and I am aware of who has said these comments. Those are not statements or comments that have any nature or use in impeaching Gilchrist as a witness in this case. Those won't come in. Anything further?

Tr. Trans. at 21–22.

prohibited Mitchell from cross examining Gilchrist regarding the Oklahoma Court of Criminal Appeals' statements about her reliability in its published opinion. The trial court did not prohibit Mitchell from cross examining Gilchrist regarding the fact that she had been censured by a professional association. As is discussed below, the trial court's limitation did not offend Mitchell's constitutional rights.

It is also important to note that this Court's grant of habeas relief on the rape and sodomy convictions changes the magnitude of Gilchrist's testimony as a whole. While Gilchrist testified regarding some hair, blood and fiber evidence, the bulk of her testimony concerned semen evidence which was relevant only to the rape and sodomy charges. Mitchell admitted he was at the Center when Ms. Scott was murdered. His presence at the scene is the most basic point to which the hair, fiber and blood evidence to which Gilchrist testified was relevant.

**Federal Law, as Determined by the Supreme Court.** The trial court's actual limitation on the cross examination of Gilchrist was very narrow. Mitchell was prohibited only from examining her regarding the Court of Criminal Appeals' comments. Such a restriction was certainly within the trial court's "wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Mitchell was not prohibited from exposing facts to the jury which the jury could "appropriately draw inferences relating to the reliability of the witness."

*Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).

The Court of Criminal Appeals' decision is not in square conflict with Supreme Court precedent which is controlling on law and fact, nor does the decision rest upon an objectively unreasonable application of Supreme Court precedent to new facts. *LaFevers, supra.* Habeas relief on this ground is therefore denied.[58]

## H. The Trial Court's Restrictions on Mitchell's Cross–Examination of Michael Harjochee.

As his eighth ground for relief, Petitioner claims the trial court improperly limited his cross-examination of Michael Harjochee during trial, in violation of his rights under the Sixth Amendment's Confrontation Clause. Harjochee and Ms. Scott were dating and involved in a sexual relationship prior to Ms. Scott's death. Mitchell claims this evidence was relevant to the issue of bias and also would have provided another possible source of the semen found on and around Ms. Scott's body. The Oklahoma Court of Criminal Appeals affirmed the trial court's exclusion of this evidence and limitations on the cross-examination:

> In his twelfth proposition Mitchell argues the trial court erred in prohibiting him from impeaching Michael Harjochee with questions about his sexual relationship with Scott. Scott had a steady boyfriend, Phillip Taylor, and was also seeing Michael Harjochee, a City worker who knew Mitchell. Both Harjochee and Taylor gave police body samples during the investigation. The trial court prevented Mitchell from cross-examining Harjochee regarding his sexual rela-

---

**58.** In his Petition, Mitchell says in one sentence that "any failing of trial counsel in this regard should result in relief for ineffective assistance of counsel." Petition, pp. 72–73. Mitchell does not indicate how trial counsel's assistance was below standard or how he was prejudiced by counsel's assistance. Habeas relief on this ground is denied.

tionship with Scott, as that testimony was prohibited by the rape shield statute, 12 O.S.1992 § 2412.[59] After Harjochee completed his testimony but before he was excused, Mitchell unsuccessfully asked the trial court to reconsider its ruling, stating that the questions went to witness bias.

It is well settled that an important function of the Sixth Amendment right to confrontation is cross-examination. Witness bias is always relevant, impeachment evidence which establishes bias is always relevant, and such evidence, when otherwise appropriate, is admissible.[60] Oklahoma's rape shield statute limits the admissibility of relevant evidence in rape cases. Mitchell offers no persuasive arguments for his claim that the rape shield statute should not apply when the victim is dead. Mitchell claims that Harjochee was called to connect Scott and Mitchell and consent is not at issue,[61] so the rape shield statute should not apply. On the contrary, where consent is not at issue, a defendant should be prohibited from cross-examination regarding the victim's prior sexual relations with others, and such cross-examination is improper when directed to any witness, not just the victim.[62] In addition, the testimony would

have been cumulative or of limited relevance at best. Unlike Mitchell, Harjochee was not connected to the crimes by forensic evidence. As Harjochee admitted he was dating Scott the jury had some evidence he might be biased. *Mitchell*, 884 P.2d at 1198–99.

***The Evidence and Offer of Proof During Trial.*** The prosecution presented Michael Harjochee during trial and elicited testimony from him as to comments made to him by Ms. Scott regarding comments Ms. Scott said the defendant made to her. Tr. Trans., pp. 728–733. On cross examination, Harjochee admitted he was dating Ms. Scott. *Id.* at 735.

After redirect examination was concluded, the defense asked the trial court to reconsider its ruling on the prosecution's motion in limine and to allow the defense "to go into the sexual relationship of Michael Harjochee and Elaine Scott." *Id.* at 739. The defense's motive was not "to smudge [Ms. Scott's] character and not to show consent but to show motive and bias of this witness." *Id.* at 740.[63]

■ ***Federal Law, as Determined by the Supreme Court of the United States.*** The Court of Criminal Appeals relied upon *Delaware v. Van Arsdall* in its decision. There, the Supreme Court noted that "the

---

**59.** [Oklahoma's rape shield statute provides that certain types of evidence are not admissible, including evidence of specific instances of sexual behavior by the victim "on the issue of whether the alleged victim consented to the sexual behavior with respect to the sexual offense alleged." 12 O.S. § 2412(A)(2). The statute *does not* require exclusion of evidence of specific instances of sexual behavior where the evidence is offered "for a purpose other than the issue of consent, including proof of the source of semen, pregnancy, disease or injury." 12 O.S. § 2412(B)(1).]

**60.** *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Beck v. State*, 824 P.2d 385 (Okl.Crim.App.1991).

**61.** Mitchell consistently denied any sexual assault on Scott and never claimed she consented to any form of intercourse.

**62.** *Hawkes v. State*, 644 P.2d 111, 113 n. 2 (1982); *Teafatiller v. State*, 739 P.2d 1009, 1012 (Okl.Crim.App.1987).

**63.** Mitchell argues in this matter, and also argued during pre-trial hearings, that the evidence of Harjochee's sexual relationship with Ms. Scott was relevant to the issue of who was the source of the semen found on Ms. Scott's body. This portion of the issue is moot at this juncture, as that evidence would be relevant only to the rape and anal sodomy charges, which were dealt with at pages 1226–27, above.

main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. at 678, 106 S.Ct. at 1435 (citations omitted). The Supreme Court went on to explain that boundaries may be placed on cross-examination:

Of particular relevance here, we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we have observed earlier this Term, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Id.* (internal quotation marks and citations omitted). A violation of the Confrontation Clause occurs when a criminal defendant shows that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose the jury to the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Id.* at 680, 106 S.Ct. at 1436 (citing *Davis v. Alaska*, 415 U.S. 308,

318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)) (internal quotation marks omitted).

■ As noted by the Oklahoma Court of Criminal Appeals, the jury knew Harjochee and Ms. Scott were dating at the time she was murdered. The jury, therefore, had at least an indication that Harjochee might be biased against Mitchell. This Court cannot say that a "reasonable jury might have received a significantly different impression of [Harjochee's] credibility had [Petitioner's] counsel been permitted to pursue his proposed line of cross-examination." *Id.* Certainly, this Court cannot say the Court of Criminal Appeals' decision is contrary to, or an unreasonable application of, Federal law, as determined by the Supreme Court. Habeas relief on this ground is denied.

**I. Claims of Prosecutorial Misconduct During Both Stages of Trial.**

**Statements During Closing Arguments and the Oklahoma Court of Criminal Appeals' Decision.** In his ninth ground for relief, Mitchell argues that statements made by the prosecutors during closing argument at both stages were improper and violated his rights to a fair trial under the Fourth and Eighth Amendments to the Constitution.

On Mitchell's direct appeal, the Court of Criminal Appeals first noted that Mitchell did not object to any of the state's closing arguments during trial. As a result, Mitchell waived review "of all but plain error." *Mitchell*, 884 P.2d at 1201. The court then held "[r]eview of the State's comments reveals no error which denied Mitchell a constitutional or statutory right or went to the case's foundation." *Id.* (citations omitted). The specific statements which are the subject of Mitchell's argument, and the Court of Criminal Appeals' decision concerning each set of statements, are: [64]

---

**64.** The prosecutors' statements are presented in the context of the argument in which they

1. Mitchell complains that the prosecutor first told the jury that the defense made up his story, then that Mitchell made up his story, knowing what the State could prove:

> We have a burden of proof to prove our case beyond a reasonable doubt, not beyond all doubt. And the Court instructed you that all of the facts and circumstances **must be inconsistent with not any theory of the defendant, not any theory of his innocence that he thinks up,** but any reasonable theory or conclusion of the defendant's innocence. What that is, you'll have to decide. Tr. Trans., p. 1332.

> Because when you get back to the jury room what you will have to ask yourselves is, is the defense story that they're telling you, is the defense theory of this case, **are they telling you that because it's the truth or are they telling you that because they know what we can prove?**

> . . . .

> So you have to ask yourselves **is their theory of the case garnered around what they know you can prove and then trying to explain it away or because it's the truth.** Tr. Trans., p. 1339–40.

> Again, one of the things you will have to decide for yourself is, are the defendant's shoes there with his truthful explanation or **did he try to think of a story to explain his way around the footprints because he knew we could prove those beyond a reasonable doubt.** That is something you will have to decide, ladies and gentlemen. Tr. Trans., p. 1358.

The Court of Criminal Appeals noted that, while such statements might be error in some circumstances, the jury in this case

"could have easily inferred from the evidence of the tapes and Mitchell's testimony about his former lies that he was trying to create any stories he could. Prosecutors may comment on and draw reasonable inferences and deductions from the evidence." *Mitchell,* 884 P.2d at 1201 (citations omitted).

2. Mitchell argues the following statements by the defense constitute questions to the jury as to why the defense did not call witnesses:

> Also recall, if you will, that while we maintain the burden of proof, the burden of proof is always with the state. It never shifts. **They are certainly entitled to an independent analysis and you heard evidence that they immediately before this trial requested an independent analysis.** And while we still maintain the burden of proving each and every one of these elements of the crime to you, **if they disputed our findings they were entitled to an independent analysis with theirs.** Recall, if you will, there were 720 sperm head of the sample that weren't tested. Remember that? Consider that. **Consider that if they disagree with our results they can present theirs.** Tr. Trans., p. 1338.

With regard to these statements, the Court of Criminal Appeals held that a prosecutor

> may legitimately comment on a defendant's failure to either call a material witness or account for his absence. Comment on a defendant's access to evidence and witnesses is permissible. These comments noted Mitchell's ability to call witnesses without drawing any conclusions for the jury. In addition, the prosecutor prefaced the comments

were contained. Where the specific portions complained of by Petitioner are included in a larger statement, the specific portion complained of is emphasized with bold print. The quoted text is exactly as it is found in the trial transcript.

by saying that the burden of proof was always on the State.

*Mitchell,* 884 P.2d at 1201–02 (citations omitted).

3. The prosecutors misstated the evidence with regard to the serological evidence on the presence of semen inside Ms. Scott's vagina:

> You noticed all of the talking the defense counsel did about the anal sodomy he never once addressed the rape. You know why that was? Because **both Brian Wraxall and Joyce Gilchrist confirm each other's testimony that there was semen and sperm found inside the vagina of Elaine Marie Scott.** That's why there was not much talk about that up here a few moments ago. Tr. Trans., p. 1398.

The Court of Criminal Appeals first noted that this statement was, indeed, incorrect.

> However, every misstatement of fact does not amount to impermissible argument. Mitchell has not shown, and the record does not reflect, that this statement was purposely made in bad faith to mislead or prejudice the jury and Mitchell has not shown any actual prejudice, given the evidence linking him to the crime. The jury was instructed that what attorneys said was not evidence, and the evidence presented by the witnesses was clear and understandable.

*Mitchell,* 884 P.2d at 1202 (footnotes and citations omitted).

4. Mitchell claims that both prosecutors argued, during second stage closing arguments, that anything less than a death sentence would reward Mitchell for his crimes:

> Ladies and gentlemen, **I submit to you if you assess a sentence of life without parole will serve to undermine the defendant's murder. To lock the defendant up forever will not take from the defendant his family. It won't take from Alfred Brian Mitchell his** friends, television, movies, three square meals a day. To assess life without parole will not deprive Alfred Brian Mitchell what he has deprived the Scott family of. It certainly will not deprive Alfred Brian Mitchell of what he has taken from Elaine Scott, her life. Tr. Trans., p. 1441.

> I suggest to you that harsh punishment, retribution for his crimes is an important part of our system of justice. **Are you 12 willing to allow him to go sit in a cell with three meals a day, color TV set and live out the rest of his life? I suggest to you if you give him a life sentence or life without parole he will go down and sit on that bunk and laugh because he has won, because he hasn't got his just desserts for what he did to Elaine Scott and everybody.** Tr. Trans., p. 1468–69.

The Court of Criminal Appeals recognized that the comment suggesting Mitchell would "laugh because he has won" "strongly resembles the error in *McCarty* [*v. State,* 765 P.2d 1215 (Okla.Crim.App. 1988)], where the prosecutor wondered if the defendant was 'grinning and laughing' when he killed the victim. We do not condone such argument. However, the comments are not so improper, in light of the evidence presented, as to have affected the jury verdict." *Mitchell,* 884 P.2d at 1202 (citation omitted).

5. Mitchell next complains that the prosecutors urged the jury to adopt their personal measure of justice and that only the death sentence would avenge Ms. Scott's death:

> **Ladies and gentlemen, the death penalty** will not terrorize Brian Mitchell the way he terrorized Elaine Scott. It will not humuliate [sic] Alfred Brian Mitchell the way he humiliated Elaine Scott. And it will not cause the pain and suffering that Alfred Brian Mitchell caused to

Elaine Scott but it **will ensure that justice is done**. Tr. Trans., pp. 1441–42.

Is there any justice in his living and taking up space in breathing somebody else's air when Elaine Scott's ashes have been scattered into the ocean? Tr. Trans., p. 1469.

Consider all of the evidence carefully. Weigh it. Balance it like we have told you. Think about the evidence that he put on. Consider that. Go back there and pray if you want to. But I ask you **the only verdict for justice in this case for what he has done is a sentence of death**. Thank you. Tr. Trans., p. 1470.

The Court of Criminal Appeals noted that prosecutors should not express a personal opinion or hold a jury to their personal standards of justice. These statements, however, "appealed to the jury's understanding of justice and asked that standard be upheld," as opposed to expressing the prosecutor's personal standards. *Mitchell*, 884 P.2d at 1202.

6. The prosecutor made arguments urging the jury to ignore any pleas for sympathy by the defense, but also urged sympathy for Ms. Scott's family:

I anticipate the defendant will play on your sympathy not to put the defendant to death. And in that regard I would like to remind you that you didn't do anything. You are doing your civic duty in following the law. You didn't tell this defendant to beat this 21 year old woman to death. Tr. Trans., p. 1441.

When the defense tries to lay a guilt trip on you, remember it's Alfred Brian Mitchell and only Alfred Brian Mitchell that has brought us together and done this. See, it's too easy for some defense lawyer to tell you that a death verdict won't bring the victims back. That's true. That's true. But please, when the defense tells you after I speak what a caring and intelligent person the defen-

dant is and how he needs a structured environment . . . . Tr. Trans., p. 1442 **Remember, ladies and gentlemen, as the defense asks you to let Alfred Brian Mitchell to sit at McAlester for the rest of his life, remember a little boy's prayers to God to bring his sister back. Prayers that will forever be unanswered because of Alfred Brian Mitchell**. Thank you. Tr. Trans., pp. 1443–44.

The Court of Criminal Appeals held this evidence was admitted as victim impact testimony from Scott's mother "and is a proper subject for argument." *Mitchell*, 884 P.2d at 1202.

7. Prosecutors successfully objected to Mitchell's testimony regarding remorse for his participation in the assault. Tr. Trans. 1287–90. The prosecution then capitalized on the lack of evidence of remorse in its closing arguments:

Number one, **there has been no remorse, not one shred shown throughout this trial**. Maybe he's sorry because he got caught. But as you have seen he has grinned at times during this trial, and as Mr. Deason noted yesterday at other times he has just been plain bored. And now, as Mr. Deason said, he's scared. He's scared because it's judgment day. Nowhere, nowhere has this man been decent enough to show any remorse. Tr. Trans., p. 1442.

You saw his emotions [on the videotape]. There was none. Have you ever at any point, any time seen him express any remorse or grief for what he did? Yet he set in here and cried. He cried because he's caught, as I told you. He came in this courtroom, took an oath to tell the truth, looked you all straight in the face and told you another story. It was another story that you found by your verdict was not the truth. He set up there and cried crocodile tears for

Elaine but it was based on a lie and that's what you folks told him by your verdict. **He wants you to give him the benefit of a doubt. Show him mercy. Show him hope, consideration when he's not even capable of admitting what he did or expressing remorse for his victim.** Tr. Trans., p. 1466.

The Court of Criminal Appeals held:

This does not amount to telling the jury to punish Mitchell for his trial conduct rather than the crimes charged. Mitchell's testimony brings his manner and attitude before the jury as evidence and therefore a legitimate subject for comment. However, the State should not have argued remorse itself as the court has already found it was not relevant to the trial. In light of the evidence presented this argument alone cannot be said to have influenced the jury verdict.

*Mitchell,* 884 P.2d at 1203.

***Federal Law, as Determined by the Supreme Court of the United States.*** Because the Supreme Court has addressed claims of prosecutorial misconduct on several occasions, the issues presented by Petitioner in this habeas proceeding must be determined by reference to the Supreme Court's decisions. 28 U.S.C. § 2254(d)(1). The Supreme Court's holdings in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) and *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) are particularly instructive on Petitioner's claims.

In *Darden,* the petitioner, who was appealing a death sentence, argued that the prosecution's closing argument "rendered his conviction fundamentally unfair and deprived the sentencing determination of the reliability that the Eighth Amendment requires." *Id.* at 178–79, 106 S.Ct. at 2470. The Court first noted that the remarks must be viewed in the context of the entire trial. Similar to the present case, the Court noted that the prosecutor's argu-

ment should be condemned. The argument did not, however, render the trial unfair. *Id.* at 179, 106 S.Ct. at 2471. "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . The relevant question is whether the prosecutors' comments so infected the trial with unfairness to make the resulting conviction a denial of due process." *Id.* at 181, 106 S.Ct. at 2471 (internal quotations and citations omitted). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *DeChristoforo,* 416 U.S. at 642, 94 S.Ct. at 1871).

The Court held:

Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial. The prosecutor's argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent . . . . The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges . . . reduced the likelihood that the jury's decision was influenced by argument.

*Id.* at 181–82, 106 S.Ct. at 2471–72 (internal quotation marks and citations omitted).

■ *Prosecution Comments Which Are Not Claimed to Have Misstated the Evidence or Implicate Other Specific Constitutional Rights.* The above reasoning from *Darden* is applicable to Mitchell's claims which are set forth at paragraphs

one (1) (comments that the defense made up stories), four (4) (argument that any sentence other than death would reward Mitchell), five (5) (argument that the death sentence was the just punishment), six (6) (arguments for and against sympathy for the victims and Mitchell) and seven (7) (comments as to Mitchell's lack of remorse), above. These arguments do not purport to involve the misstatement of evidence or to implicate "other specific rights of the accused."

As was important to the Supreme Court in *Darden*, this Court recognizes that the trial court in the present case instructed the jury numerous times that the State was required to prove each element of the crimes charged beyond a reasonable doubt. O.R., pp. 383, 391. The trial court also instructed that the state has the burden "of presenting the evidence that establishes guilt beyond a reasonable doubt. The defendant must be found not guilty unless the State produces evidence which convinces you beyond a reasonable doubt of each element of the crime." O.R., p. 391. The trial court further instructed the jury that the statements and arguments of the attorneys are not evidence and that closing arguments "are not evidence and are presented for purposes of persuasion only." O.R., pp. 384, 385. During the second stage, the trial court incorporated its first stage instructions and also gave an additional instruction placing the burden on the state to prove the material allegations in the Bill of Particulars beyond a reasonable doubt. O.R., pp. 425, 439.

Arguments of counsel "must be judged in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990). Certainly, when the prosecutors' state-ments are taken in context of the arguments in which they were made and in context of the trial as a whole, including the trial court's instructions, they cannot be said to have deprived Mitchell of the due process of a fair trial.

■ *Prosecution Comments Which Mitchell Claims Misstated the Evidence or Implicated Other Specific Constitutional Rights.* Mitchell claims the comments set forth at paragraphs two (2) and three (3) above [65] implicated specific constitutional rights and, therefore, must be judged under a higher standard than comments which do not run the risk of depriving him of such rights. Indeed, the Supreme Court distinguishes cases in which the claim is that the prosecutors' remarks misstate or manipulate the evidence or amount to a denial of due process from cases which involve deprivation of a specific guarantee of the Bill of Rights. In the latter, special care is to be taken to assure that prosecutorial conduct did not so prejudice "a specific right ... as to amount to a denial of that right." *DeChristoforo* at 643, 94 S.Ct. at 1871; *see also, Darden* at 182, 106 S.Ct. at 2472.

Mitchell claims the prosecutor's comments regarding his failure to call witnesses to controvert the state's evidence attacks the presumption of innocence, the prosecution's burden to prove guilt beyond a reasonable doubt, and his right not to call witnesses on his own behalf. He claims the prosecution's misstatement of the evidence violates the principles of the Supreme Court's ruling in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

As all of these comments relate directly and only to Mitchell's convictions for rape

---

**65.** Paragraph 2 addresses the prosecutors' comments about Mitchell's right to call witnesses to dispute the serological evidence put on by the state. The prosecution's misstate-ment that Wraxall agreed with Gilchrist's finding of sperm and semen in Ms. Scott's vagina is the subject of paragraph 3.

and sodomy, his claims in this regard are now moot, as this Court has granted habeas relief on the rape and sodomy convictions.

### J. *The Trial Court's Refusal to Instruct on Manslaughter and Murder in the Second Degree.*

 *Factual Background and Oklahoma Court of Criminal Appeals' Decision.* Mitchell next argues that the evidence presented during trial required the jury be instructed as to the elements of manslaughter and second-degree murder, as lesser included offenses of first-degree murder. The Oklahoma Court of Criminal Appeals, while noting that defendants in capital cases are "entitled to instructions on any lesser included non-capital offenses supported by the evidence," rejected Mitchell's claim:

> Mitchell requested instructions on first degree manslaughter and second degree murder. He argues in support of both that the jury could have believed his trial testimony that he looked on as C. Ray killed Scott, that the evidence might have supported either a lack of intent to kill or no design to effect death on C. Ray's part, and that Mitchell can take advantage of that as an aider and abettor. This Court has held that where a defendant claims he is innocent and another committed the crime, the defendant is not entitled to instructions on lesser included offenses.[66] When a defendant's testimony excludes all but one theory of defense, he is deemed to have elected that theory.[67] Mitchell testified

that he had nothing to do with any violence directed at Scott, but watched as C. Ray beat and killed her. Mitchell cannot use the "aider and abetter" theory to benefit from lesser included instructions that would apply to actions he says he did not commit.

*Id.* at 1200–1201.

Mitchell, during the course of his videotaped interrogation, stated that he hit Ms. Scott but did not kill her. Rather, Mitchell claimed to have looked on as a man named Kareem actually delivered the blows that killed Scott. St. Ex. 82. Mitchell relies on this evidence to support his claims that the jury should have been instructed as to lesser-included offenses. This Court notes, however, that Mitchell, at the beginning of his trial testimony, admitted he had lied to the police but testified he was prepared to tell the truth during trial. Tr. Trans., pp. 1243–44. He then testified he did not hit Ms. Scott, but that all of the blows had been delivered by a man called C. Ray. *Id.* at 1256–69.

*Federal Law, as Determined by the Supreme Court of the United States.* Mitchell relies on *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in support of his claim that the trial court should have instructed the jury regarding the proof necessary to convict him of first degree manslaughter and second degree murder. Mitchell argues the jury should have been given the choice to convict him of these lesser included, non-capital offenses. Mitchell's case is clearly distinguishable from *Beck* and is governed by

---

**66.** *Smith v. State*, 727 P.2d 1366, 1371 (Okl. Crim.App.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987); *Wiley v. State*, 551 P.2d 1146, 1150 (Okl.Crim.App. 1976). The wounds here were extensive and severe; several of them could have caused death. The nature and extent of wounds plus the surrounding circumstances have precluded instructions based on lack of intent or lack

of design to effect death. *Smith v. State*, 737 P.2d 1206, 1210 (Okl.Crim.App.1987), cert. denied, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987) (brutal beating with blunt object); *Camron v. State*, 829 P.2d 47 (Okl. Crim.App.1992) (beating with shotgun).

**67.** *Smith*, 727 P.2d at 1371.

the Supreme Court's later decisions interpreting and applying *Beck.*

In *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court clarified its holding in *Beck:*

> *Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury's discretion is thus channeled so that it may convict a defendant of any crime fairly supported by the evidence.

*Id.* at 611, 102 S.Ct. at 2053. The Oklahoma Court of Criminal Appeals, applying state law, held the evidence did not warrant the instructions Mitchell claims should have been given. This Court has been presented with no evidence to refute the Court of Criminal Appeals' decision. Nor is this decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, and it is not contrary to, or an unreasonable application of, clearly established Federal law. This Court must give deference to the Court of Criminal Appeals' decision. 28 U.S.C. § 2254(d).

Furthermore, this Court finds that relief on this ground based on the Supreme Court's decision in *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). There, the Court distinguished *Beck*, where a conviction automatically resulted in a death sentence, from the facts then before it, where the jury was not required to impose the death sentence. In *Hopkins*, a three-judge panel made the sentencing determination and was not limited to sentencing the defendant to death, but had an option to sentence him to life imprisonment. *Id.*, 118 S.Ct. at 1901–02.

Likewise, the jury in the case at bar was not required to sentence Mitchell to death if it found him guilty of first degree mur-

der. In addition to a sentence of death, the jury had the option to sentence him to life imprisonment or life imprisonment without the possibility of parole. O.R. at 426. As a result, there was no possibility that the death penalty would be imposed upon a defendant whose conduct did not merit it because the jury was convinced that he had committed some serious crime and should not escape punishment entirely, as was the case in *Beck. Hopkins*, 118 S.Ct. at 1901.

The decision of the Oklahoma Court of Criminal Appeals is entirely consistent with existing Federal law, as determined by the Supreme Court. Habeas relief on this ground must therefore be denied.

**K.** *Constitutionality of the "Continuing Threat" Aggravating Circumstance.*

■ *The Oklahoma Criminal Court of Appeals' Decision and Applicable Federal Law.* Mitchell next argues that the "continuing threat" aggravator is unconstitutional in that it does not narrow the class of individuals eligible for the death penalty. The Oklahoma Court of Criminal Appeals succinctly rejected this argument:

> This Court has held continuing threat may be proved by prior convictions, unadjudicated crimes, or the circumstances of the crime for which the defendant is on trial. This Court … has consistently rejected Mitchell's argument.
>
> More particularly, the evidence supporting the continuing threat aggravator against Mitchell included the testimony of his juvenile rape victim, who testified he threatened to kill her, and his own admissions to prior juvenile crimes.

*Mitchell*, 884 P.2d at 1208.

The Tenth Circuit Court of Appeals has also consistently rejected Mitchell's argument. Most recently, in *LaFevers*, the

Court soundly rejected such an argument, relying on its decisions in *Ross v. Ward*, 165 F.3d 793 (10th Cir.1999), *Castro v. Ward*, 138 F.3d 810 (10th Cir.1998), *cert. denied*, 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998) and *Nguyen v. Reynolds, supra.*

Certainly the Oklahoma Court of Criminal Appeals' decision is in accord with established precedent in this Circuit on this issue. This Court finds no precedent of the Supreme Court which is controlling on law and fact and which is in conflict with the decision of the Court of Criminal Appeals. As a result, 28 U.S.C. § 2254(d) does not authorize habeas relief on this issue.

## L. Constitutionality of the "Heinous, Atrocious or Cruel" Aggravating Circumstance.

In his twelfth ground for relief, Mitchell argues the "heinous, atrocious or cruel" aggravating circumstance, which the jury in his case found was applicable, operates "outside constitutional bounds." This argument, too, must fail.

Mitchell's jury received two instructions regarding the heinous, atrocious or cruel aggravating circumstance:

*Instruction Number 5*

You are instructed that, in arriving at your determination of punishment, you must first determine whether at the time this crime was committed any one or more of the following aggravating circumstances existed beyond a reasonable doubt:

1. The murder was especially heinous, atrocious or cruel.

2. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

3. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

*Instruction Number 6*

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by conscious physical suffering caused by torture of the victim or serious physical abuse.

O.R. 428–429.

***The Oklahoma Criminal Court of Appeals' Decision and Applicable Federal Law.*** The Court of Criminal Appeals rejected this argument, noting that it has consistently upheld this particular aggravating circumstance "when limited by instruction to cases involving torture or serious physical abuse." *Mitchell*, 884 P.2d at 1208 (footnote omitted).

The Tenth Circuit Court of Appeals has also consistently rejected arguments similar to Mitchell's. In *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir.1998), *cert. denied*, 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998), the Tenth Circuit evaluated the constitutionality of a jury instruction very similar to Instruction Number 6, above. The Court first evaluated the Supreme Court's decision in *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In that case, the Supreme Court held that Oklahoma's heinous, atrocious or cruel aggravating circumstance was unconstitutional as it was being applied at the time. The Court noted, however, that the vagueness of the instruction could be cured by adopting a narrowing construction. *Duvall*, 139 F.3d at 793 (citing *Maynard*, 486 U.S. at 364–65, 108 S.Ct. 1853). "In particular, the

court suggested that if the Oklahoma courts had construed the aggravating circumstance to require 'torture or serious physical abuse,' such a construction 'would be constitutionally acceptable.'" *Duvall*, 139 F.3d at 793 (quoting *Maynard*, 486 U.S. at 364–65, 108 S.Ct. 1853, and citing *Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990)).

The instruction used in Mitchell's trial, and determined to be constitutional by the Tenth Circuit in *Duvall*, was adopted in response to the Supreme Court's decision in *Maynard v. Cartwright*. *Duvall*, 139 F.3d at 793;[68] *see also, LaFevers, supra.* The Oklahoma Court of Criminal Appeals' decision is not in conflict with clearly established Federal law, as determined by the Supreme Court. Habeas relief on this issue is denied.

### M. Constitutionality of the "Avoid Arrest" Aggravating Circumstance.

▮ Mitchell's thirteenth argument is that the aggravating circumstance that the murder was committed to avoid arrest is "constitutionally infirm." Mitchell claims his jury was not appropriately instructed that, before this circumstance can apply, there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest. *See, Mitchell*, 884 P.2d at 1208. Mitchell's jury was instructed that one of the aggravating circumstances which it could consider in determining whether the death penalty was appropriate was whether the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. O.R. 428.

*Factual Background, the Court of Criminal Appeals' Decision and Applicable Law.* The Oklahoma Court of Criminal Appeals recognized that application of this aggravating circumstance requires a determination of the defendant's state of mind, which may be inferred from circumstantial evidence. *Mitchell*, 884 P.2d at 1208. The court noted that Mitchell was convicted of rape and sodomy. "His previous victim testified that, after he raped her, he said if she told anyone he would kill her. Especially in light of the ensuing circumstances (she reported the rape and he was incarcerated for three years) the inference that he killed Scott to prevent her reporting the rape could be made." *Id.*

Given the fact that this Court has found it necessary to grant habeas relief on the rape and sodomy convictions, it is important to note that Mitchell was also convicted of robbery with a dangerous weapon in this case. Unquestionably, the robbery conviction could have served as the predicate crime separate from the murder for which Mitchell sought to avoid arrest. Further, Mitchell stated during his videotaped interrogation that the man whom Mitchell was accompanying stated more than once that she had to be killed so she would not report them. St. Ex. 82. Certainly, if the jury believed the killer was actually Mitchell, it could have also believed that Mitchell's recitation of the killer's motive for murdering Ms. Scott was his own.

Respondent argues the decision of the Oklahoma Court of Criminal Appeals is proper. Respondent does not, however, cite a single case (other than the Court of Criminal Appeals' opinion) in support of its argument. While Mitchell bases his argu-

---

**68.** The instruction was apparently modified slightly, "at Mitchell's request and certainly with his consent," with the addition of the phrase "conscious physical suffering." *Mitchell*, 884 P.2d at 1208. Mitchell does not argue in this proceeding that the additional phrase affects the constitutionality of the instruction.

ment on a number of decisions from the Supreme Court, Mitchell cites no case which would justify a finding that the "avoid arrest" aggravator is unconstitutionally vague. While it does not appear the Supreme Court has addressed the constitutionality of this particular aggravator, it has addressed claims of unconstitutionally vague aggravating circumstances.

In *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Supreme Court noted that factors determining eligibility and selection for the death penalty are not easily defined, as they, are "not susceptible of mathematical precision." *Id.* at 973, 114 S.Ct. at 2635. The Supreme Court's vagueness review is, therefore, "quite deferential." *Id.* The basic principle is that a circumstance is not unconstitutional if it has some "common-sense core of meaning ... that criminal juries should be capable of understanding." *Id.* at 973, 114 S.Ct. at 2636–37 (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976) (White, J., concurring in judgment)). The Supreme Court's discretionary review necessarily places emphasis on the judgment of the sentencing jury:

> In providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion. That is evident from the numerous factors we have upheld against vagueness challenges.

*Id.* at 975, 114 S.Ct. at 2636.

The Tenth Circuit Court of Appeals, in *Davis v. Zavaras,* 100 F.3d 750 (10th Cir. 1996), addressed Colorado's "avoiding or preventing lawful arrest or prosecution"

aggravating circumstance, which is worded much like Oklahoma's. The court held that the aggravating circumstance sufficiently narrows the class of persons eligible for the death penalty "by putting the focus on the purpose of the murder." *Id.* at 769 (citations omitted). The aggravator "is appropriate if the evidence indicates that a defendant has murdered the victim of a contemporaneously or recently perpetrated offense and the reason for the murder was to prevent the victim from becoming a witness." *Id.* (Citations omitted). The court reviewed numerous other decisions of federal and state courts upholding the constitutionality of this aggravator. It then noted that, in each case, "the aggravating circumstance was applied where an antecedent crime (rape or kidnaping or robbery) occurred, and the murderer killed the victim to prevent the victim's identification of the murderer for the antecedent crime." *Id.* at 770.

Mitchell was convicted of an antecedent crime (robbery) and there was undoubtably sufficient evidence for the jury to determine that Mitchell killed Ms. Scott to prevent his identification for the antecedent crime. The Oklahoma Court of Criminal Appeals' decision is not contrary to established Federal law, as determined by the Supreme Court. Habeas relief on this ground, therefore, must be denied.

### N. *Constitutionality of Sentencing Instructions.*

Mitchell next advances a number of claims that the jury was not appropriately instructed during the sentencing phase and, therefore, his fundamental Constitutional rights were violated.[69]

---

**69.** Mitchell initially advanced five arguments claiming the instructions required the jury to unanimously find mitigating circumstances.

One of these contentions was, however, expressly withdrawn in Mitchell's reply brief.

**1. The Jury was not Required to be Instructed that it had the Option to Sentence Mitchell to Life in Prison, Rather than to Death, Regardless of its Finding Regarding Mitigating and Aggravating Circumstances.**

 Mitchell's jury was informed of its sentencing options. It was not instructed, however, that, regardless of its determination of mitigating evidence and aggravating circumstances, it could nevertheless sentence Mitchell to life in prison rather than death. Mitchell argues this amounts to constitutional error. The Oklahoma Court of Criminal Appeals disagreed, holding:

A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required.[70] Mitchell requested such an instruction. The jury instructions accurately stated the law and the failure to give requested Instruction 9 was not error.[71] This Court

has consistently rejected this argument.[72]

*Mitchell,* 884 P.2d at 1206–07.

This instruction, and Mitchell's argument, are much like those considered by the Tenth Circuit in *Duvall v. Reynolds, supra.* There, the court recognized that Oklahoma "may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Duvall,* 139 F.3d at 790 (quoting *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998)). The court went on to hold the instruction was in accord with constitutional principles.

[The instruction] adequately afforded the jury an opportunity to consider mitigating evidence. The trial court did not instruct the jury that they must assess death if they found the aggravating circumstances outweighed the mitigating circumstances. Instead, the trial court instructed the jury that they were "authorized to consider imposing a sentence of death" upon the finding of an aggravating circumstance. Because the in-

---

**70.** *Parks v. State,* 651 P.2d 686 (Okl.Crim.App. 1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

**71.** Instruction 2 told the jury they must impose a noncapital sentence if they had a reasonable doubt about Mitchell's guilt as to the Bill of Particulars. Instruction 7 authorized the jury to consider imposing the death penalty upon a unanimous finding of one or more aggravating circumstances beyond a reasonable doubt.
[The complete text of Instruction Number 7 which was given to Mitchell's jury is:
Aggravating circumstances are those which increase the guilt or enormity of the offense. In determining which sentence you may impose in this case, you may consider only those aggravating circumstances set forth in these instructions.
Should you unanimously find that one or more aggravating circumstances existed be-

yond a reasonable doubt, you would be *authorized to consider* imposing a sentence of death.
If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life or imprisonment for life without parole.
O.R. 430 (emphasis added)]

**72.** See, e.g., *Malone v. State,* 876 P.2d at 714–15 (Okl.Crim.App.1994); *Allen v. State,* 871 P.2d at 102; *Brown v. State,* 871 P.2d at 73; *Robedeaux v. State,* 866 P.2d at 435; *Pickens,* 850 P.2d at 339; *Fisher v. State,* 845 P.2d 1272, 1278 (Okl.Crim.App.1992), cert. denied 509 U.S. 911, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

struction did not prevent consideration of mitigating circumstances, and because no juror would have understood it to do so, the instruction is constitutionally permissible.

*Duvall,* 139 F.3d at 790 (citing *Buchanan,* 118 S.Ct. at 761).

Likewise, the instruction in the present case did not prevent the consideration of mitigating evidence. The jury was clearly informed that it was "authorized to consider imposing a sentence of death" if one or more aggravating circumstances was found beyond a reasonable doubt. This instruction complies with the Constitution, as construed by the Supreme Court.

### 2. The Jury was Properly Instructed Regarding Its Consideration of Mitigating Evidence.

■ Petitioner's next two arguments are very similar and can be considered together. He first argues that his jury was not required to consider any mitigating evidence. Rather, consideration of the mitigating evidence was left to the jury's "unguided discretion." His second complaint is that the jury was not instructed that aggravators must outweigh mitigators beyond a reasonable doubt.

The jury was in fact instructed that mitigating circumstances are those "which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case." Instruction No. 8, O.R. 431. The jury was further instructed as to the mitigating circumstances for which evidence was offered and that it was the jury's

decision whether the circumstances existed, and whether the circumstances were mitigating. Instruction No. 9, O.R. 432. The jury was next instructed:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

Instruction No. 10, O.R. 433.

*The Court of Criminal Appeals' Decision and Applicable Federal Law.* The Oklahoma Court of Criminal Appeals rejected these arguments. With regard to the argument that the jury was allowed to ignore the mitigating evidence altogether, the court held that the instruction that mitigating circumstances "may be" considered "reflects the correct constitutional standard; any mandatory language would infringe on the jury's duty to determine individual punishment. This Court has consistently rejected this argument." *Mitchell,* 884 P.2d at 1207 (citations omitted).

The Court of Criminal Appeals similarly rejected the argument that the jury should have been instructed that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt:

> Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required.[73] Whether aggravators outweigh mitigating circumstances is left to the jury's discretion.[74] This Court has consistently rejected this argument.[75]

*Mitchell,* 884 P.2d at 1206.

---

**73.** *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

**74.** *Johnson v. State,* 731 P.2d 993, 1004 (Okl. Crim.App.1987), cert. denied, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987).

**75.** See, e.g., *Malone v. State,* 876 P.2d 707, 715 (Okl.Crim.App.1994); *Revilla v. State,*

As the Oklahoma Court of Criminal Appeals recognized, the Supreme Court has clearly addressed these issues. In *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Court provided the following guidance regarding jury consideration of mitigators:

[T]he State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra*, at 326, 109 S.Ct. at 2951; *Franklin v. Lynaugh*, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.*, at 380, 110 S.Ct., at 1198; see also *Johnson, supra*, at 367–68, 113 S.Ct., at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. See *Tuilaepa, supra*, at 978–79, 114 S.Ct., at 2638–39 (noting that at the selection phase, the State is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled

discretion); *Stephens*, supra, at 875, 103 S.Ct., at 2741–42 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg*, supra).

*Id.*, 522 U.S. at 276–77, 118 S.Ct. at 761–62.

*Buchanan* is only the most recent in a number of cases espousing the same principles: once a defendant has been declared eligible for the death penalty, the jury has wide, "unbridled" discretion, in deciding whether or not death is the appropriate sentence. In *Tuilaepa v. California*, 512 U.S. 967, 979, 114 S.Ct. 2630, 2638, 129 L.Ed.2d 750 (1994), the Court specifically stated: "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." See also, *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2750, 77 L.Ed.2d 235 (1983).

This is not a case similar to *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), relied on by Petitioner. The jury in Mitchell's case was not instructed *not* to consider evidence of mitigating circumstances. Instead, Mitchell's jury was instructed as to the definition of mitigating circumstances and that "the determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case." Instruction No. 8, O.R. 431. The jury was then given a list of the mitigating circumstances as to which evidence had been provided. Instruction Number 9, O.R. 432. Petitioner cites no case which

877 P.2d 1143, 1153 (Okl.Crim.App.1994); *Ellis*, 867 P.2d at 1301; *Trice*, 853 P.2d at

216; *Woodruff*, 846 P.2d at 1149 (Okl.Crim. App.1993).

indicates this method of instructing the jury is constitutionally unsound.[76]

The Oklahoma Court of Criminal Appeals' decision was clearly in harmony with Federal law, as determined by the Supreme Court, on these issues. Habeas relief on these grounds is denied.

### 3. The Jury was Properly Instructed Regarding its Consideration of Mitigating and Aggravating Circumstances.

Mitchell's next complaint regarding the jury instructions is based entirely on his interpretation of Oklahoma law. He argues that the jury was improperly instructed regarding its duty to weigh each individual aggravating circumstances against the totality of mitigating circumstances. Mitchell interprets 21 O.S. § 701.11 to require such an exercise. The Oklahoma Court of Criminal Appeals, relying exclusively on Oklahoma law, rejected this argument. *Mitchell*, 884 P.2d at 1207.

Mitchell provides no indication to this Court as to how he believes the United States Constitution was violated by what he believes was an improper application of Oklahoma's statute. Nevertheless, the cases cited above clearly demonstrate that states are not required to impose any particular burden of proof or method of evaluation on a sentencing jury's consideration of mitigating and aggravating circumstances. The Court of Criminal Appeals' decision was not in contravention of the relevant Supreme Court precedent. Habeas relief on this ground is denied.

### O. *Constitutionality of the Trial Court's Admission of Victim Impact Evidence.*

For his fifteenth ground of error, Mitchell argues the trial court's admission of victim impact evidence during the sentencing phase violated the constitutional prohibition on ex post facto application of criminal statutes and his due process right to a fair trial. The evidence complained of is the testimony of Ms. Scott's parents regarding Ms. Scott's altruistic intentions and activities, as well as the effect her death had on their closely knit family.[77] This Court has closely reviewed the testimony and finds it to have been brief and as reserved as could be possible under the circumstances. The transcript does not reveal any emotional or passionate outbursts or prolonged emphasis on any particular point. Trans., Second Stage, 6/25/92, pp. 12–19.

*Factual Background and Court of Criminal Appeals Decision.* Elaine Scott was murdered on January 7, 1991. Mitchell was tried June 15–26, 1992. In the interim, Oklahoma amended its statute regarding sentencing for first degree murder to allow victim impact evidence to be presented during the sentencing phase. This amendment became effective April 13, 1992. Mitchell argues this law "altered the elements of the sentencing decision in favor of the prosecution." The Oklahoma Court of Criminal Appeals determined the new law was procedural in nature and,

**76.** This Court also notes that Petitioner does not argue that the list of mitigating circumstances as to which the jury was informed evidence had been presented was not accurate or complete.

**77.** Petitioner indicates that he believes the testimony of Maria Bustos, whom Petitioner previously raped and threatened to kill, was improperly admitted as victim impact testimony. It is this Court's view, however, that Ms. Bustos' testimony was properly admitted as part of the State's case to prove the continuing threat aggravator and not as victim impact testimony. In fact, it would not fit within the statutory description of victim impact evidence: "The state may introduce evidence about the victim and about the impact of the murder on the family of the victim." 21 O.S. § 701.10.

therefore, did not violate the Constitution. *Mitchell,* 884 P.2d at 1203–04.

**The Supreme Court's Payne v. Tennessee Decision.** The change in Oklahoma law allowing the admission of victim impact evidence was apparently predicated on the Supreme Court's decision in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). *Mitchell,* 884 P.2d at 1204. There, the Supreme Court overruled its previous decisions disallowing victim impact evidence during the sentencing phase of murder trials, holding such evidence is not "per se" barred by the Eighth Amendment. In so holding, the Court noted its previous rulings that a sentencer may not be precluded from considering any relevant mitigating evidence proffered by the defendant in support of a sentence less than death. *Payne,* 501 U.S. at 822, 111 S.Ct. at 2606. "But it was never held or even suggested in any of our cases . . . that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed." *Id.*

The Court opined that allowing the defendant to present mitigating evidence but prohibiting the State from presenting any evidence about the life taken by the defendant had

> unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering a quick glimpse of the life which a defendant chose to extinguish or demonstrating the loss to the victim's family and society which has resulted from the defendant's homicide.

*Id.* at 822, 111 S.Ct. at 2607 (internal citations and quotations omitted). Victim impact evidence is designed to show the jury each victim's "uniqueness as an individual human being, whatever the jury might think the loss to the community resulting from his death might be." *Id.* The Court further explained the purpose and use of such evidence:

> Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities . . . . In the majority of cases . . . victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief . . . . Courts have always taken into consideration the harm done by the defendant in imposing sentence . . . .
>
> [A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. The state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

*Id.* at 824–25, 111 S.Ct. at 2608 (citations and internal quotations omitted).

■ **The Admission of Victim Impact Testimony did not Violate Mitchell's Due Process Rights.** As noted above, the Supreme Court's decision in *Payne* is not without limits. The Supreme Court recognized that there may be a time when the victim impact evidence is so unduly prejudicial that it renders the trial fundamental-

ly unfair. In that event, the Due Process Clause of the Fourteenth Amendment could provide relief for the criminal defendant.

There is no indication in the present case that the evidence admitted was unduly prejudicial or that it rendered the trial fundamentally unfair. As also noted above, the victim impact evidence was not prolonged or unduly emotional. This case does not present the circumstance which the Supreme Court mentioned as a *possibility* in *Payne*. Mitchell's due process rights were not violated by the jury's consideration of the victim impact evidence.

■ *The Admission of Victim Impact Testimony Did Not Violate the United States Constitution's Prohibition on Ex Post Facto Laws.* The prohibition on ex post facto laws is found at Article 1, Section 9 of the Constitution. The Supreme Court's many decisions interpreting and applying the Ex Post Facto Clause demonstrate that it was not violated in the present case.

The basic rule gleaned from the Clause and decisions interpreting and applying it is that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990). In *Collins*, the Supreme Court initially discussed its decisions involving the Ex Post Facto Clause. The Court then determined the following standard is the appropriate standard to apply in determining whether the Ex Post Facto Clause has been violated:

[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime,

after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

*Id.*, 497 U.S. at 42, 51, 110 S.Ct. at 2719, 2724 (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925)).

■ In evaluating a claim that the Ex Post Facto Clause has been violated, the inquiry is whether a legislative change "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *California Dept. of Corrections v. Morales*, 514 U.S. 499, 506, 115 S.Ct. 1597, 1602, n. 3, 131 L.Ed.2d 588 (1995).

The Supreme Court's holding in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) is instructive on the issue presently before this Court. There, the petitioner claimed that a change in Florida law which altered the functions of the judge and jury in the imposition of the death sentence constituted an ex post facto violation.[78] The Court rejected this claim:

"[T]he inhibition upon the passage of ex post facto laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." *Gibson v. Mississippi*, 162 U.S. 565, 590, 16 S.Ct. 904, 910, 40 L.Ed. 1075 (1896). "(T)he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, see *Malloy v. South Carolina*, 237 U.S. 180, 183, 35 S.Ct. 507, 59 L.Ed. 905, and not to limit the legislative control of remedies and modes of procedure which do not affect

---

**78.** The law changed after the petitioner had committed the murder but before he was tried.

matters of substance." *Beazell v. Ohio*, supra, at 171, 46 S.Ct., at 69.

*Id.* at 293, 97 S.Ct. at 2298.

The Court went on to note that the change in the law was clearly procedural. It simply "altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 294, 97 S.Ct. at 2298.

> The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute.

*Id.* at 294, 97 S.Ct. at 2298–99 (quoting *Hopt v. Utah*, 110 U.S. 574, 589–90, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)).

The reasoning is applicable to the case now before this Court. The law demarcating the evidence which Mitchell's jury was allowed to consider in determining whether the death penalty should be imposed changed after Mitchell murdered Elaine Scott. However, the crime for which he was indicted, the punishment prescribed for that crime, and the quantity or degree of proof necessary to establish his guilt all remained unchanged.

 Petitioner's argument that the admission of victim impact evidence "reduced the prosecution's burden to obtain a death sentence" is simply not supported by the facts. Petition at p. 127. The prosecution's burden of proof in obtaining a death sentence in this case was not changed between the time Mitchell murdered Elaine Scott and his trial. The fact that the

legislature saw fit to allow additional evidence to be considered by the jury on this issue did not change the quantity or degree of proof necessary. The Ex Post Facto Clause does not prohibit the application of new evidentiary rules in trials for crimes committed before the effective date of the laws. *Collins*, 497 U.S. at 43, 110 S.Ct. at 2719, n. 3.

The decision of the Oklahoma Court of Criminal Appeals is entirely consistent with the decisions of the Supreme Court on this issue. Habeas relief on this issue is denied.

**P.** **The Trial Court's Refusal to Instruct the Jury Regarding Informer Testimony.**

Mitchell's next argument is that the trial court should have instructed the jury to carefully scrutinize the testimony of Andre Wilson as an informer.[79] Mitchell does not argue the refusal to give such an instruction constitutes a constitutional violation and does not indicate how or why habeas relief would be available even if it was error to refuse to give the jury instruction.

***Factual Background.*** Andre Wilson testified that he had seen Mitchell walking on the same block where Ms. Scott's car was found on the day of the murder. Tr. Trans., pp. 758–763. After Wilson and the person with whom he was walking walked away from Mitchell, they proceeded toward Ms. Scott's car. *Id.* at p. 763. Wilson opened the car door and took a pair of gloves from the car. *Id.* at p. 764. In his trial testimony, Wilson testified that his

---

**79.** The record received and reviewed by this Court does not include jury instructions which were requested by the parties but rejected by the trial court. The rejected jury instruction, as quoted by Petitioner in his Petition, at page 133, is:

> The testimony of an informer who provides evidence against a defendant for pay, for

immunity from punishment, or for personal advantage or vindication must be examined and weighed by you with greater care than the testimony of an ordinary witness whether the informer's testimony has been affected by interest or by prejudice against the defendant is for you to determine.

taking gloves from the car was auto burglary and he was therefore initially reluctant to talk to the police. *Id.* at p. 765–66. He was not, however, prosecuted for this particular crime. *Id.* at p. 773. He further testified that he had not been promised anything in exchange for his testimony. *Id.* at pp. 773, 778.

**The Court of Criminal Appeals' Decision.** Relying on these facts, the Oklahoma Court of Criminal Appeals rejected this claim on Mitchell's direct appeal. Although the Court of Criminal Appeals did not cite any law in support of its decision, it did not appear to rely on Federal law:

> As Wilson does not appear to have acted as an informant in this case the requested instruction would have been inappropriate. Although Wilson was incarcerated at the time of trial, he was not a jailhouse informer; he was questioned by the police shortly after the murder because his fingerprints were found on Scott's car. He admitted on the stand that he took a pair of women's gloves from Scott's unlocked car, saying "That's auto burglary right there." Mitchell makes much of the fact that Wilson was not prosecuted for auto burglary in connection with this case. Trial testimony clearly indicates that Wilson had no deal with the prosecution, had no idea why he wasn't prosecuted for auto burglary and received no benefit on his current sentence in exchange for his testimony. Nothing in the record suggests Wilson was promised or expected to receive any benefit when he originally spoke to police. Wilson was not working for police or in any way involved in the investigation. Oklahoma cases regarding informers deal with persons who work as undercover agents, work with or for police, expect to be paid for their information, expect a reduced sentence or charge for their testimony, or expect some other benefit as a result of their involvement. None of these elements are present in this case.

*Mitchell,* 884 P.2d at 1201.

■ **Federal Law, as Determined by the Supreme Court.** As has been noted elsewhere in this Order, a claim that an instruction is erroneous under state law is not a basis for habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 71, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). "The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Id.* (citing *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983)). Habeas relief, therefore, is not granted simply as a result of a ruling regarding the giving of an instruction which may have been improper under state law. *Id.*

In order to obtain habeas relief, Mitchell must show that the failure to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977) (quoting *Cupp v. Naughten,* 414 U.S., at 147, 94 S.Ct. at 400 (1973)). The burden is especially heavy where, as here, no erroneous instruction was given and the claim is based instead on the failure to give an instruction. *Id.*

■ Mitchell does not argue that the failure to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." Rather, Mitchell's claim is based entirely on an argument that the trial court, and Court of Criminal Appeals, simply misapplied state law. As the Court of Criminal Appeals noted, the testimony presented at trial demonstrates that the requested instruction would not have been appropriate. Wilson was not an informant, as contemplated by Oklahoma law, because he had no motive for and received no benefit as a

result of his testimony. This Court is bound by the Court of Appeals' determination in this regard.

There is no indication that the trial court's refusal to give the requested instruction so infected the trial as to violate due process. The decision of the Oklahoma Court of Criminal Appeals is not contrary to Federal law as determined by the Supreme Court. Habeas relief on this issue is denied.

### Q. Constitutionality of Trial Court's Refusal to Allow Allocution.

*Factual Background and Court of Criminal Appeals' Decision.* Mitchell's seventeenth claim is that the trial court improperly denied his request for allocution. Mitchell filed his *Motion to* [sic] *Allocution Right* in the trial court, in which he requested "the right to make an unsworn statement to the jury prior to their deliberation in the second stage of these proceedings." O.R., pp. 143–44. The trial court overruled Mitchell's motion. 6–12–92 Trans., pp. 10–11. Mitchell was, however, given the opportunity to speak to the Court prior to his formal sentencing. Trans., Sentencing, 7/10/92, p. 4. He declined the trial court's invitation to speak.

The Oklahoma Court of Criminal Appeals rejected Mitchell's claim that his Constitutional rights were violated by the trial court's refusal to let him make an unsworn statement to the jury before sentencing:

Mitchell's motion for allocution was first discussed during the January 10, 1992 motions hearing; at that time the trial court reserved its ruling and asked Mitchell to provide suggested guidelines for his requested speech. The trial court overruled the motion for allocution during the motions hearing of June 12, 1992, and Mitchell did not raise the matter again. He was given an opportunity to speak at the sentencing hearing but declined.

A motion for allocution traditionally provides a defendant the chance to address the sentencing body in a personal plea for mercy. The Supreme Court has discussed allocution but has never held that a criminal defendant has a constitutional right to allocution such that if he requests allocution he must be allowed to speak. Mitchell concedes that allocution is usually held appropriate at the sentencing hearing rather than second stage argument. However, he argues that under Oklahoma law a trial court must follow the jury sentencing recommendation, so any argument to the sentencing court would be pointless.[80] We find this argument unpersuasive. Mitchell also claims his due process liberty interest in a jury sentencing requires that he be allowed to address the second stage jury.[81] We have recently held that a request for allocution is satisfied where a defendant is given the opportunity to address the court at formal sentencing.[82]

---

80. 22 O.S.1991 § 926.

81. *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).

82. *Freeman v. State,* 876 P.2d 283, 289–90 (Okl.Crim.App.1994). We neither address nor decide the issue of a defendant's request to speak to the jury before sentencing under 21 O.S.1991 § 701.10(D).
[21 O.S.1991 § 701.10(D) provides: "This section shall not be construed to authorize the

introduction of any evidence secured in violation of the Constitutions of the United States or of the State of Oklahoma. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death." The Oklahoma Court of Criminal Appeals later determined that this statute does not give a criminal defendant the right to allocution. Rather, it gives *either* the defendant *or* his lawyer the right to present *argument,* "which encompasses more than a

*Mitchell,* 884 P.2d at 1204.

**Federal Law, as Determined by the Supreme Court.** Mitchell apparently bases his claim on two separate Constitutional grounds. He first claims that the right to allocution is codified under Oklahoma law. He argues, then, that this codification creates a liberty interest in allocution which is protected by the Fourteenth Amendment. His second claim is that the right of allocution is recognized as an independent component of due process. These arguments will be addressed in turn.

██ *Mitchell Had No Liberty Interest in or Right to Allocution.* Mitchell relies on 22 O.S. § 13(2) in support of his claim that Oklahoma law gave him a right to allocution. His reliance is misplaced. That statute provides that a criminal defendant is entitled to "be allowed counsel, as in civil actions, or to appear and defend in person and with counsel." The Oklahoma Court of Criminal Appeals has held that this statute does not give a criminal defendant the right to allocution. It does not "give a defendant a statutory or constitutional right to make a plea for mercy, or otherwise address his sentencing jury, where he has elected counsel to make closing argument; you cannot have both. If a defendant elects to have his attorney speak, he cannot have also a second closing argument." *Duckett v. State,* 919 P.2d 7, 21 (Okla.Crim.App.1995), *cert. denied* 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997). Mitchell's attorney made closing argument. Mitchell, therefore, did not have the right also to speak—to have a second closing argument—under Oklahoma law.

Mitchell relies on *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), in support of his claim that, if he had a right to allocution under Oklahoma law, a violation of that right would amount to a violation of a Constitutionally-derived liberty interest. Although this Court is not certain that, even if Mitchell did have a right to allocution, the Supreme Court's holding in *Hicks* would support his claim that he had a liberty interest in allocution which was violated, it is not necessary to determine that issue. Because Mitchell had no right to allocution under Oklahoma law, the trial court's denial of his request could not be a denial of a liberty interest, protected by the Constitution.

*There Is No Due Process Right to Allocution.* Mitchell acknowledges "[t]he Supreme Court has yet to recognize the right of allocution explicitly." In fact, the Supreme Court, in *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), held that the trial court's failure to ask a defendant whether he would like to speak before his sentence was imposed, as the trial court was required by statute to do, was not a constitutional violation.[83] The petitioner in *Hill* sought habeas corpus relief pursuant to 28 U.S.C. § 2255. The Supreme Court denied relief, holding:

> The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdic-

plea of mercy. Argument entails summation of the material in the record of the case and inferences therefrom against the death penalty." *Duckett v. State,* 919 P.2d 7, 22 (Okla. Crim.App.1995), cert. denied, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997).]

**83.** The pertinent part of Rule 32, Federal Rules of Criminal Procedure, provides: "Be-

fore imposing a sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment." *Hill,* 368 U.S. at 425–26, 82 S.Ct. at 470.

tional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure. It does not present 'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'

*Hill,* 368 U.S. at 428, 82 S.Ct. at 471. The Court went on to note that the defendant had not affirmatively asked to speak before sentencing. The Court, therefore, did not decide whether habeas relief under Section 2255 would be available under other circumstances. *Id.* at 429, 82 S.Ct. at 472.

Petitioner has not cited, and this Court has not found, any case in which the Supreme Court has "clearly established" a due process right to allocution. At most, the Supreme Court's decisions can be read to leave the issue undecided. Even if that is the case, that is not enough for Mitchell to be entitled to relief under 28 U.S.C. § 2254. The Oklahoma Court of Criminal Appeals' decision is not in square conflict with Supreme Court precedent which is controlling on law and fact and does not rest upon an objectively unreasonable application of Supreme Court precedent to new facts. *LaFevers, supra.* Habeas relief on this ground is denied.

**R.** ***Constitutionality of the Trial Court's Denial of Mitchell's Motion to Quash Jury Panel.***

■ ***Factual Background and Oklahoma Law.*** Petitioner's eighteenth ground for relief is a claim that the trial court improperly denied his Motion to Quash the Jury Panel, which was grounded on the basis that the process used to assemble the jury panel in Oklahoma County is constitutionally flawed. Petitioner claims the process "denies an accused the Constitutional right to a jury chosen from a fair cross section of the community." Under Okla-

homa law, potential jurors are summoned from a pool of all people over the age of eighteen who hold a current driver's license and who reside in the county where the trial is to be held. 38 O.S. § 18. Mitchell claims this procedure restricts the possible jurors by, first, excluding many potential jurors who are unwilling or unable to obtain a driver's license. This, he claims, violates the fair cross-section requirement of the Sixth Amendment.

The second problem with this method, according to Mitchell, is that the pool developed from licensed drivers excludes or diminishes representation from the following classes of persons otherwise eligible to serve:

1. Indigent people unable to afford a license or to have one reinstated after its loss;

2. People with religious beliefs who do not believe in the use of cars or licenses for cars;

3. Out of state students who live here and attend college or university;

4. People stationed here on federal military bases who do not need an Oklahoma driver's license;

5. Elderly people who may have physical infirmities which have caused them to surrender their driver's license;

6. People who simply find no need for a driver's license;

7. Individuals who mistrust the government and have "retreated from the system";

8. People with physical handicaps that prevent them from passing the required examination.

Mitchell further complains that Oklahoma law allows people over seventy (70) years of age to be voluntarily excused from jury duty. *See,* 38 O.S. § 28(a).

A hearing was held on Mitchell's motion to quash the jury panel. The testimony of the Oklahoma County Jury Clerk during the hearing revealed that approximately 850 potential jurors were summoned for jury duty during the term in which Mitchell was tried and convicted and approximately 380 to 385 people actually reported as summoned. Tr. Trans., p. 35. The jury clerk could not testify as to how many of the people who did not appear for jury duty in response to their subpoenas had been excused, moved, were deceased, or simply chose not to appear. *Id.* at 36–37.

The Oklahoma Court of Criminal Appeals rejected Mitchell's arguments, relying on *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The Court of Criminal Appeals noted that Mitchell "neither identifies a distinct and underrepresented group nor shows any systematic exclusion of any purported group in the jury selection process." *Mitchell,* 884 P.2d at 1196. In addition, the Court of Criminal Appeals relied on its long line of cases in which it rejected claims that the fair cross-section requirement had been violated by the voluntary withdrawal of jurors over 70 years of age. *Id.* (citing *Brown v. State,* 871 P.2d 56, 63 (Okla.Crim.App.1994); *Ellis v. State,* 867 P.2d 1289, 1294 (Okla.Crim.App.1992); *Robedeaux v. State,* 866 P.2d 417, 423 (Okla. Crim.App.1993); *Trice v. State,* 853 P.2d 203, 208 (Okla.Crim.App.1993); *Sellers v. State,* 809 P.2d 676, 678 (Okla.Crim.App. 1991); *Fox v. State,* 779 P.2d 562, 566 (Okla.Crim.App.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990)).

***Federal Law, as Determined by the Supreme Court.*** As the Oklahoma Court of Criminal Appeals recognized, the controlling decision of the Supreme Court on this issue is *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). There, the Supreme Court evaluated the Sixth and Fourteenth Amendments' requirement that juries be drawn from a fair cross-section of the community, further explaining its holding in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975):

> [J]ury wheels, pools of names, panels, or venire from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*Duren,* 439 U.S. at 363–64, 99 S.Ct. at 668 (quoting *Taylor,* 419 U.S. at 538, 95 S.Ct. at 702).

To establish a prima facie violation of the fair-cross-section requirement, Mitchell must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>
> (2) that the representation of this group in venire from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668.

*Mitchell Has Not Met Any of the Three Prongs of the Test.* Mitchell has not met the first prong of the Supreme Court's test because there is no evidence that the "groups" identified by Mitchell are "sufficiently numerous and distinct" so that "if they are systematically eliminated from jury panels, the Sixth Amendment's fair-cross-section requirement cannot be satisfied." *Id.* (quoting *Taylor*). Furthermore, there is no indication that the "groups" are actually *excluded.* Mitchell merely hypothesizes that the "groups" are excluded or their representation is diminished. He provides no evidence or support that these

actually are groups or that the representation of the "groups" is diminished.

Second, there is no evidence that the "groups" identified are not fairly and reasonably represented in relation to the number of such person in the community. To meet this prong of the test, Mitchell "must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Id.* Mitchell provides no evidence of the percentage of the community made up by the groups he alleges are underrepresented and, again, provides no evidence as to the make-up of the jury panel that was actually present in his case.

Finally, Mitchell is required to show that the alleged underrepresentation of the "groups," "generally, and on his venire, was due to their systematic exclusion in the jury-selection process." *Id.* at 366, 99 S.Ct. at 669. The petitioner in *Duren* met this requirement by showing that a "large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year." *Id.* This demonstrated that the underrepresentation was systematic—inherent in the particular jury-selection process utilized.

There is absolutely no evidence in the present case that the pool from which Mitchell's jury was chosen did not represent a fair cross-section of the community. This Court cannot say that the Oklahoma Court of Criminal Appeals' decision was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding. Habeas relief on this ground is denied.

### S. Supplemental Claims Presented by Mitchell: Double Counting of Evidence in Support of Two Aggravating Circumstances and Failure to Adequately Inform Jury of Life Without Parole Option.

When he filed his initial brief, Mitchell also requested that he be allowed to submit two additional grounds for relief. This Court granted Mitchell's request and the parties have fully briefed the two additional grounds presented by Mitchell.

The parties spend a great deal of effort arguing about whether Mitchell's failure to exhaust the issues presented in his supplemental claims bars their consideration by this Court. Because both claims are without merit, this Court need not decide that issue. 28 U.S.C. § 2254(b)(2).[84]

### 1. The Constitution Was Not Violated by the Evidence Presented in Support of Aggravating Factors.

Mitchell claims that the State relied on the "brutal" and "callous" nature of the crimes to establish both the "especially heinous, atrocious and cruel" and "continuing threat" aggravating circumstances. He also alleges the State relied on allegations of rape and anal sodomy to support both the "especially heinous, atrocious or cruel" and "avoid arrest" circumstances. Mitchell relies on the State's *Notice of Evidence in Aggravation to be Offered in Support of Death Penalty*, O.R. 88–89, in support of these claims.

This Court notes that the *Notice* filed by the State includes, in addition to the specific facts and allegations set forth therein,

---

**84.** Once again, however, the State elected to stand entirely on its exhaustion/procedural bar argument and to not present any argument whatsoever regarding the merits of Mitchell's claims.

notice of the State's intent to incorporate all first stage evidence into the penalty stage of the trial. Furthermore, this Court notes that the State is not required to provide notice of its intent to use evidence admitted in the first stage to support any particular aggravating circumstance. *Cleary v. State*, 942 P.2d 736 (Okla.Crim.App.1997); *Johnson v. State*, 731 P.2d 993 (Okla.Crim.App.1987).

**Federal Law Regarding Duplicative Aggravating Factors.** In *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996), the Tenth Circuit Court of Appeals held that, where one aggravating factor "necessarily subsumes" another, there is a tendency to skew the weighing process and create the risk that the death sentence will be imposed unconstitutionally. This concern is present when the jury weighs aggravating factors against mitigating factors in order to determine whether to impose the death sentence, as is required under Oklahoma law. "[T]he mere finding of an aggravating factor cannot but imply a qualitative value to that factor .... When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot assume it would have made no difference if the thumb had been removed from death's side of the scale." *Id.* at 1112 (internal citations and quotation marks omitted).

The Tenth Circuit further explained its holding in *McCullah* in its decision in *Cooks v. Ward*, 165 F.3d 1283 (10th Cir. 1998), *cert. denied* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999). There, the court clarified that *McCullah* should not be interpreted to mean

> any time evidence supports more than one aggravating circumstance, those circumstances impermissibly overlap, per se. The test we apply is not whether certain evidence is relevant to both aggravators, but rather, whether one ag-

gravating circumstance "necessarily subsumes" the other.

*Id.* at 1289 (citing *McCullah*, 76 F.3d at 1111).

The aggravators in *Cooks* were not duplicative. Although the jury may have considered the same evidence in support of both the "prior conviction" and "continuing threat" aggravators, the "prior conviction" factor focused on the particular nature and circumstance of the defendant's past conduct, while the "continuing threat" factor focused attention on the likelihood of future violent conduct. *Id.* In addition, under Oklahoma law, "evidence regarding the callous nature of the crime, alone, is sufficient to support a jury's finding a defendant poses a continuing threat to society." *Id.* (citations omitted). The abundance of evidence which demonstrated that the murder was callous refuted any claim that the jury's finding of the "continuing threat" circumstance was dependent on evidence that he had committed a prior violent crime. The "continuing threat" aggravator, therefore, did not subsume the "prior conviction" aggravator. *Id.*

*The Law as Determined by the Supreme Court.* The Supreme Court has not forthrightly answered the question of whether the Constitution would be violated if a death sentence were imposed based on duplicative evidence in support of more than one aggravator. Recently, however, the Court indicated that the use of duplicative evidence in support of a single aggravator might not violate the Constitution. In *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the Court was faced with a decision of the Fifth Circuit Court of Appeals which held, based on *McCullah*, that the death sentence was unconstitutionally based on duplicative aggravating factors. The Court first noted:

We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in *McCullah*[85] and the Fifth Circuit appears to have followed here. What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. See *Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Petitioner's argument (and the reasoning of the Fifth and Tenth Circuits) would have us reach a quite different proposition—that if two aggravating factors are "duplicative," then the weighing process necessarily is skewed, and the factors are therefore invalid.

*Id.* at 398–99, 119 S.Ct. 2090. The Supreme Court did not, however, go on to expressly address the "double counting" proscription imposed by the Tenth and Fifth Circuits. Instead, the Court said "[e]ven accepting, for the sake of argument, petitioner's 'double counting' theory, there are nevertheless several problems with the Fifth Circuit's application of the theory in this case." *Id.* The Court then held the two aggravators before it were not impermissibly duplicative, even under the "double counting" theory.

█ *Evidence Supporting the "Especially Heinous, Atrocious or Cruel" and "Continuing Threat" Aggravating Circumstances.* Mitchell claims all the evidence supporting the heinous, atrocious or cruel aggravator also supported the continuing threat aggravator. He argues the heinous, atrocious or cruel aggravator focuses exclusively on the "heinous" nature of the crime, while the continuing threat aggravator is supported by the "callous" nature of the crime.

The jury was instructed regarding the meaning of both the heinous, atrocious or cruel and continuing threat aggravating circumstances:

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase especially "heinous, atrocious or ·cruel" is directed to those crimes where the death of the victim was preceded by conscious physical suffering caused by torture of the victim or serious physical abuse.

O.R. 429. In contrast, the jury was instructed that it must find, beyond a reasonable doubt, "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" in order to impose the death sentence based on the continuing threat aggravator. O.R. 428.

In his second stage closing argument, the prosecutor focused on the particular evidence which supported each of these aggravating circumstances. Regarding the heinous, atrocious or cruel circumstance, the prosecutor emphasized Mitchell's beating Ms. Scott with his fists, with a golf club that he ultimately broke while hitting her, and finally with a coat tree, in addition to the five times he stabbed her with a compass. Tr. Trans., p. 1438. Regarding the continuing threat circumstance, the prosecutor focused exclusively on Mitchell's prior rape of a twelve year old girl and the effect his release from prison had on her family. He commented

---

**85.** The Tenth Circuit, in a decision subsequent to *McCullah*, has emphasized that factors do not impermissibly overlap unless one "necessarily subsumes" the other. *Cooks v. Ward*, 165 F.3d 1283, 1289 (1998).

on the fact that Mitchell was released from the Rader Center only days before he murdered Ms. Scott. Tr. Trans., pp. 1438–40, 1466–67.

The evidence supporting these two aggravating circumstances was not duplicative. One of the factors was not subsumed by the other. Mitchell's argument is without merit.

■ *Evidence Supporting the "Especially Heinous, Atrocious or Cruel" and "Avoid Arrest" Aggravating Circumstances.* The jury was instructed that the "avoid arrest" aggravating circumstance would exist if it found beyond a reasonable doubt that Ms. Scott's murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. O.R. 428. As discussed above, at pages 1243–44, the jury could have based its finding of this aggravator on the fact that it found Mitchell guilty of robbery. The prosecutor did not specify a particular crime as the predicate for this aggravator. Rather, he encouraged the jury to look at the evidence and argued it would leave no doubt that Ms. Scott was murdered to avoid Mitchell's arrest and lawful prosecution for "his crimes." Tr. Trans., pp. 1437–38. As discussed above, the State's support for the "especially heinous, atrocious or cruel" factor was the horrible struggle and the beating to which Ms. Scott was subjected before her death. There is no duplication in these aggravating circumstances. This claim, too, is without merit.

2. **The Jury was Properly Informed of the Meaning of "Life Without Parole."**

Mitchell bases his claim that the jury should have been instructed specifically as to the meaning of "life without parole" on the Supreme Court's decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

In *Simmons,* the sentencing jury had the option of sentencing the petitioner to death or to "life imprisonment." Under the law of South Carolina, life imprisonment does not carry with it the possibility of parole. *Simmons,* 512 U.S. at 158, 114 S.Ct. 2187. The petitioner therefore requested instructions defining "life imprisonment" for the jury. To justify his request for such an instruction, the petitioner offered a public-opinion survey which showed that the vast majority of citizens misunderstood "the meaning of 'life imprisonment' in South Carolina." *Id.* at 159, 114 S.Ct. 2187. Thereafter, during deliberations, the jury sent a note to the trial court asking: "Does the imposition of a life sentence carry with it the possibility of parole?" *Id.* at 160, 114 S.Ct. 2187. Rather than answering the question asked by the jury, the trial court responded: "You are instructed not to consider parole or parole eligibility in reaching your verdict. Do not consider parole or parole eligibility. That is not a proper issue for your consideration. The terms life imprisonment and death sentence are to be understood in the plan [sic] and ordinary meeting." *Id.* In resolving the issue, the Supreme Court held:

> The Due Process Clause does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain. In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibili-

ty, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed. Three times petitioner asked to inform the jury that in fact he was ineligible for parole under state law; three times his request was denied.[86] The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

*Id.* at 161–62, 114 S.Ct. 2187 (internal quotations and citation omitted).

 Mitchell's case is much different than the case presented in *Simmons.* The jury that was responsible for sentencing Petitioner was given three choices of sentence on the first degree murder conviction: death, imprisonment for life or imprisonment for life without parole. (O.R. 425, 426, 430). Unlike the jury in *Simmons,* Mitchell's jury could not have been misled—"imprisonment for life without parole" means imprisonment for life without parole. Mitchell's jury did not send a note out or in any other way indicate that the jurors had any question about the meanings of the three sentencing options. Further, while the State did indeed focus on

its argument that Mitchell presented a continuing threat to society, at no time did the State use the sentencing choices to "create a false dilemma" for the jury. *Simmons* at 171, 114 S.Ct. 2187. The jury's choices were clearly set forth in the instructions it received.

In contrast to the jury in *Simmons,* Mitchell's jury could not have been misled by the sentencing choices. This Court therefore holds that Mitchell was not denied due process by virtue of the jury instructions setting forth sentencing options. Habeas relief on this basis is denied.

### V. *Request for Evidentiary Hearing.*

As previously noted, this Court granted Mitchell an evidentiary hearing on his *Brady* claim in connection with his rape and sodomy convictions.

Mitchell also generally requests an evidentiary hearing "as to the application as a whole and particularly as to any issues involving facts not apparent from the existing record and to any issues involving facts disputed by the state." Pet. Brief at p. 148.[87] Mitchell requested, and was denied, an evidentiary hearing in connection with his petition for post-conviction relief before the Oklahoma Court of Criminal Appeals. *Mitchell,* 934 P.2d at 351. This Court notes that Mitchell requested, and was granted, evidentiary hearings in the

---

**86.** Mitchell does not claim that he requested, and the trial court rejected, a jury instruction defining life without parole. In fact, Mitchell does not suggest what type of instruction should have been given to explain the meaning of "life without parole." This Court has scoured the trial transcript and cannot discern whether such a jury instruction was requested. There are indications in the transcript that the defense offered instructions which were rejected by the trial court and intended to be included in the record for purposes of appeal. Trans. Second Stage, 6/25/92, pp. 135, 140–41. The trial court

record does not, however, include any proposed but rejected instructions.

**87.** Mitchell also filed a *Motion and Brief for Evidentiary Hearing* in this Court on October 9, 1997. He did not present any description of evidence which would be helpful to the Court in this motion, and acknowledged that his requested for an evidentiary hearing "remained essentially the same." The additional request was presented to renew the original request and advise the Court it had not been abandoned.

trial court with regard to a number of the grounds for relief at issue in the present proceeding. With the exception of his *Brady* claim, Mitchell does not argue in this Court that he requested and was denied an opportunity to develop the factual basis for any of his claims in the trial court.

*Claims for Which Mitchell Failed to Develop the Factual Bases.* Where Mitchell was given the opportunity to develop the factual basis for a particular claim, but failed to do so, this Court must look to the mandates of the AEDPA to determine whether a request for an evidentiary hearing will be granted. 28 U.S.C. § 2254(e)(2). Where Mitchell failed to develop the factual basis of his claim, this Court shall not hold an evidentiary hearing on the claim unless Mitchell shows that:

 (A) the claim relies on—

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

*Id.*

The trial court held hearings regarding Mitchell's claims advanced in Parts IV(A), (B), (C), (D), (P) and (Q), above. This Court finds that the arguments and evidence provided in support of these claims do not meet any of the three requirements set forth in 28 U.S.C. § 2254(e)(2).

■ *Claims for Which Mitchell Did Not Fail to Develop the Factual Basis.* With regard to the remainder of Mitchell's claims, this Court will assume that he sought to develop their factual basis in

State court, by way of his request for an evidentiary hearing on post conviction. The standards of the AEDPA, therefore, do not apply. *Miller v. Champion,* 161 F.3d 1249 (10th Cir.1998). The pre-AEDPA standard applies and a petitioner is entitled to an evidentiary hearing if "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Id.* at 1253 (citing *Medina v. Barnes,* 71 F.3d 363, 368–69 (10th Cir.1995)). The Tenth Circuit recently applied this rule in *Boyd v. Ward,* 179 F.3d 904 (10th Cir.1999). There, the court was faced with circumstances similar to those presently faced by this Court:

> Applying that test, an evidentiary hearing is not warranted. [Petitioner's] request for further fact finding is general. He fails to indicate what specific facts he would prove through a hearing. Cf. *Stouffer v. Reynolds,* 168 F.3d 1155, 1168 (10th Cir.1999) (district court erred in failing to hold evidentiary hearing to assess ineffective assistance of counsel claims where the petitioner alleged specific, particular facts which if proved would entitle him to relief.)

*Boyd,* 179 F.3d at 924–25. Mitchell, likewise, makes a general request for an evidentiary hearing. He does not indicate what facts, if any, he would prove through a hearing and what effect such facts would have on his claims. Mitchell's request for an evidentiary hearing on all issues (with the exception of his *Brady* claim in connection with his rape and sodomy convictions) is therefore denied.

## VI. *Conclusion.*

After a complete review of the transcripts, trial record, appellate record, and record on post-conviction, the briefs filed by the Petitioner and Respondent, the testimony and evidence presented during the evidentiary hearing, and the applicable

law, this Court holds that Petitioner's *Petition for Writ of Habeas Corpus by a Person in State Custody* shall be denied in part and conditionally granted in part. Petitioner's petition is GRANTED with regard to his convictions for rape and anal sodomy, as those convictions violate Petitioner's constitutional right to due process. ACCORDINGLY, the Writ of Habeas Corpus shall issue, unless within one hundred eighty (180) days of the entry of this Order, the State grants Petitioner a new trial on the rape and forcible anal sodomy charges. Habeas relief is DENIED on all other grounds.